Robert P. Getty et al., Appellants, v. Jeremiah Devlin et al. Executors, etc., et al., Respondents.

Where several persons are engaged in a joint enterprise for their mutual benefit, each has a right to demand and expect from his associates good faith in all that relates to their common interests, and no one of them will be permitted to take to himself a secret and separate advantage to the prejudice of the others; and where one, unknown to his associates, causes to be transferred to the association property previously purchased by himself, at a price exceeding that paid by him therefor, he is accountable to his associates for the profits thus made.

Four persons, owning and having interests in certain oil land which had cost them about $30,000, agreed to combine their interests to organize a company and transfer their interests to the company at a large price above the cost, and to divide the profits. To carry out this purpose they procured a subscription paper to be drawn up by which the subscribers agreed to pay the sums subscribed for " the purchase of property," specifying therein the lands above mentioned, at the sum of $125,000. Each of them subscribed $5,000, and caused certain others to sign as decoy subscriptions for about half the amount to be subscribed. These subscriptions were not intended to be paid, and were not, in fact, paid, although so marked. Plaintiffs, induced by the fraudulent assurances of one of the originators of the scheme and of their agent that the lands originally cost $125,000, and upon the belief that they became subscribers, on a footing of equality with the others, subscribed also and paid in their subscriptions, as did others, to the amount required. The moneys so paid were received and divided by the four associates. A company was thereupon organized, the property transferred to it, and the stock taken in payment and divided among the subscribers, as well

those who had not as those who had paid, in proportion to their sub-scriptions. Plaintiffs subsequently made loans to the company, and under executions issued upon judgments rendered thereon, sold a portion of the lands. In an action for the fraud, *held*, that said four associates were each and all liable: 1st. Because the putting the subscription paper in circulation, with their names subscribed, and under the circumstances, was a gross fraud upon every subscriber ignorant of the facts; 2d. Because the original purchases inured to the benefit of the *bona fide* subscribers, and in receiving and dividing the large profits a fraud was perpetrated upon them; 3d. Because the four associates might be regarded as partners in that adventure, and all were responsible for the false representations made by either or by their agent; that plaintiffs could not, on account of such fraud, recover all the moneys paid by them, because they could not restore said associates to the position they were in before the transfer to the company, but that the latter could be required to account for the profits made upon the lands thus fraudulently appropriated, and plaintiffs could recover their *pro rata* share thereof.

As to whether said associates could be required to account for their own and the other unpaid subscriptions, as if paid; also, as to whether there should be a redistribution of the stock among the *bona fide* subscribers, *quere.*

Also, *held*, that the above facts being undisputed a finding of the court at Special Term that the transactions were innocent and free from fraud was error of law.

(Argued June 13, 1873; decided September term, 1873.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial district affirming a judg-ment in favor of the defendants, entered upon the decision of the court at Special Term.

This action was brought to obtain relief on account of a fraud alleged to have been committed upon the plaintiffs in the purchase and sale of oil lands, and the formation of the Federal Oil & Coal Company. The alleged perpetrators of the fraud, and the executors of a deceased one, and all the stockholders of the company, and the company itself were made parties. The facts appear sufficiently in the opinion.

Upon those facts the court found "that neither the defend-ant, John Bryan, nor Daniel Devlin, deceased, made, or authorized to be made, any representation that they or either of them were or was not an owner of the lands and leasehold interest in question, nor did they or either of them say or do

anything or authorize any one to say or do anything to induce the plaintiffs to believe that they or either of them had no interest as owner therein, nor did they or either of them fraudulently or otherwise conceal or take any measures to conceal the knowledge of their or either of their ownership or interest therein. Nor did they or either of them make any false representation to the plaintiffs or any other subscriber on the subject of said land or their or either of their interests therein."

And as conclusions of law, "that the complaint in this action as to the defendants, John Bryan and Jeremiah Devlin and Henry F. Spaulding, as executors of the last will and testament of Daniel Devlin, deceased, should be dismissed with costs."

Judgment was entered accordingly.

*Samuel Hand* for the appellants. It was error in law for the court to find a fact unsupported by evidence, or to refuse to find a fact proved by uncontradicted evidence. (*Mason* v. *Lord*, 41 N. Y., 476; *Putnam* v. *Hubbell*, 42 id., 106.) It is not necessary, in order to maintain this action, to show actual fraudulent representations by Bryan or Devlin personally. (*Leslie* v. *Willey*, 47 N. Y., 650; *Bennett* v. *Judson*, 21 id., 238; *Elwell* v. *Chamberlain*, 2 Bosw., 230; *Hunter* v. *H. R. Iron Mach. Co.*, 20 Barb., 493.) It was a fraud *per se* for the four defendants to sign the agreement in the pretended character of copurchasers, and to conceal the fact that they were the real sellers. (*Conkey* v. *Bond*, 36 N. Y., 426.) The concealment from plaintiffs of the cost of the property was a fraud. (*Hitchens* v. *Congreve*, 4 Russ., 562; *Conybeare* v. *N. B. R. Co.*, 1 De Gex, F. & J., 578; *Carpenter* v. *Danforth*, 19 Abb. Pr., 225; *Bliss* v. *Matteson*, 45 N. Y., 22, 45; *Re Overend, Gurney & Co.*, 3 L. R., April 1867, Eq. Series, 619–624.) The use of decoy subscribers was a fraud. (*Blake's Case*, 34 Beav., 639; *Ross* v. *Estates Invest. Co.*, L. R., February, 1867; 3 Eq. S., 134–137.) The contract was vitiated on account of fraud in its formation. (2 R. S.,

677, § 53; *Rex* v. *Bernard*, 7 Car. & P., 784; *Foss* v. *Harbottle*, 2 Hare, 461; *Conkey* v. *Bond*, 36 N. Y., 429; *Rawlins* v. *Wickham*, 3 De G. & J., 304.) Devlin was trustee of the trust created by the original agreement, and is accountable to plaintiffs for a breach thereof. (*Robinson* v. *Smith*, 3 Paige, 223.) Devlin's executors are proper parties to an action to redress a breach of the trust. (*Cunningham* v. *Pell*, 5 Paige, 607; *Knatchbull* v. *Fearnhead*, 3 M. & C., 122; *Munch* v. *Cockrell*, 8 Sim., 219; *Perry* v. *Knott*, 4 Beav., 179.) Plaintiffs, in order to rescind the contract, were not obliged to reinstate the perpetrators of the fraud in the condition they were in at first. (*Masson* v. *Bovet*, 1 Den., 69.)

*John E. Develin* for the executors of Daniel Devlin, deceased, and Henry F. Spaulding, respondents. The decision of the General Term affirming a judgment of Special Term on exceptions to the findings of fact by a judge trying a cause without a jury, unless such findings are clearly against evidence, is final. (*Brown* v. *Vredenbergh*, 43 N. Y., 195, 199; *Mason* v. *Lord*, 40 id., 476; *Burgess* v. *Simonson*, 45 id., 225; *Field* v. *Munson*, 47 id., 221.) Unless plaintiffs restored or offered to restore defendants' testator to his original condition they could not recover. (*Voorhees* v. *Earl*, 2 Hill, 288; *Masson* v. *Bovet*, 1 Den., 69; *Wheaton* v. *Baker*, 14 Barb., 594; *Minturn* v. *Main*, 3 Seld., 220, and cases cited; *Matteawan Co.* v. *Bentley*, etc., 13 Barb., 641; *Nichols* v. *Michaels*, 23 N. Y., 264 [272].)

*Francis Kernan* for John Bryan, respondent. The conclusions of the court below, as to matter of fact, are conclusive in this court, when there is any testimony to sustain them or a conflict as to them. (*Fellows* v. *Northrup*, 39 N. Y., 117; *Putnam* v. *Hubbell*, 42 id., 106, 113.) Clear and satisfactory evidence is required to prove fraud. (1 C. & H. Notes to Phil. Ev., 297, 298, and cases cited.) There is nothing from which constructive fraud can be made out to render the agreement voidable and authorize the court to rescind it. (Story's

Eq. Jur., §§ 315, 316; *Davoue* v. *Fanning*, 2 J. Ch., 252, and cases cited; *N. Y. Ins. Co.* v. *Nat. Pro. Ins. Co.*, 14 N. Y., 85, 91; *Conkey* v. *Bond*, 36 id., 427; S. C., 34 Barb., 276.) Even if there had been fraud, actual or constructive, plaintiffs are not entitled, upon the case made, to have the agreement rescinded and the money paid for the land and leases refunded. (*Cobb* v. *Hatfield*, 46 N. Y., 533; *Masson* v. *Bovet*, 1 Den., 69, 73, 74; *Baker* v. *Robins*, 2 id., 136; *Mayer* v. *Shoemaker*, 5 Barb., 319; *Wheaton* v. *Baker*, 14 id., 594; *Fisher* v. *Fredenhall*, 21 id., 82; Willard's Eq. Jur., 302, 303; *Sar., etc., R. R. Co.* v. *Row*, 24 Wend., 74.) Bryan's intent was an issue in the case, and evidence thereon was competent. (*Seymour* v. *Wilson*, 14 N. Y., 567.)

EARL, C. The following are the facts established on the trial of this action by uncontroverted and undisputed evidence. Prior to February 22d, 1865, the defendant, John Bryan, purchased leasehold interests in certain lands situated in the State of Ohio, and obtained in his own name leases or assignments of leases of such lands. The actual cost to him of such leasehold interests did not exceed the sum of $15,300. Prior to the same date the defendant, Robert H. Arkenburgh, or Bryan in his name, had obtained contracts for the purchase of lands in Ohio in fee, at a cost of not exceeding $15,000. These purchases and contracts were made through the agency of the defendant, Jacob S. Atwood, who knew the actual cost of the leasehold interests and lands. Prior to the same date, defendants Arkenburgh, Bryan and Atwood came to an understanding with Daniel Devlin, since deceased (whose executors were made defendants), that he, Devlin, should pay Bryan $7,650, and should be entitled to one-half the interest Bryan then had in the property, and that all the property should be sold and disposed of for their joint benefit, and that Atwood should be entitled to one-third of the profits arising from the sale and that out of the residue of the proceeds the original cost of the property should be paid to Devlin, Arkenburgh and Bryan, and the remainder divided

equally between the three last named. In pursuance of this understanding, and to carry into effect the scheme of disposing of such lands, they procured the following paper to be drawn, to wit:

"We, the undersigned, do hereby subscribe and agree to pay forthwith the amount set opposite our names for the purchase of property in Washington, Monroe and Athens counties, Ohio, as per memorandum annexed, being leasehold interest in 745 acres, and 207 acres in fee, at the sum of $125,000 (one hundred and twenty-five thousand dollars), payments to be made to Daniel Devlin, Esq., at Broadway Bank, trustee for the purchasers, in whose name the title to property shall be taken, said property to be put into an association for development upon such terms as these subscribers may elect after this subscription is complete."

"New York, 22d *February*, 1865."

To this paper was attached a description of the real estate therein referred to, being nearly all the real estate purchased and taken by Bryan & Arkenburgh as above stated. The said paper was subscribed first by said Devlin and then by defendants, R. H. Arkenburgh and Bryan, each for $5,000, before either of the plaintiffs saw the same, and was left in the hands of Atwood with the understanding that he should procure other subscribers thereto. Atwood subsequently subscribed the paper for $5,000. At the time of subscribing neither Devlin, Arkenburgh, Bryan nor Atwood intended to pay any money upon their subscriptions, and did not, in fact, pay anything. After the paper had been signed by Devlin, Arkenburg and Bryan, it was signed by the plaintiff, Holcomb, for $5,000, J. A. Amelung & Son, as a firm, for $5,000, and R. P. Getty & Son, as a firm, for $5,000, and by the other defendants, the entire subscriptions amounting to $125,000. The plaintiffs paid their subscription to Devlin, and of the other subscriptions nearly $50,000 in amount was also paid to him. The balance of the subscriptions was not paid, and such subscriptions were not made in good faith, were not

intended to be paid when made, and were procured, wholly or in part, through the agency of Devlin, Bryan, Arkenburgh, and Atwood or some one of them, with the understanding that they were not to be paid. It was proven that some of such subscriptions were made in the name of the friends and relatives of the persons last named, and marked paid, with the understanding that they were to hold their interests as presents from them. The $64,500 thus paid to Devlin was subsequently deposited with or paid to Arkenburgh and Bryan, who were copartners, except that Devlin retained the amount coming to him under the above-mentioned agreement as to the division thereof.

The plaintiff, Holcomb, was induced to subscribe the agreement by the false representations made to him by Atwood that the property cost $125,000. The defendant, A. A. Gifford, was the son-in-law of Atwood, and was a subscriber for $5,000, which was marked paid, but which he never paid nor intended to pay, and he took the agreement to procure subscribers thereto, and the plaintiffs, Getty and Amelung, subscribed the same at his solicitation. He represented to them, in order to induce them to subscribe, that the lands had cost $125,000, and that the subscribers would have the same at their original cost. The plaintiffs believed these representations and supposed that the lands purchased in Ohio cost or were to cost the $125,000.

After the subscriptions had been made to the extent of $125,000, a meeting of the subscribers was called and steps taken to organize a company to take and develop the land. The Federal Oil and Coal Company was finally organized as a corporation under the laws of this State, with a capital of $1,000,000, divided into 100,000 shares of $10 each. That the stock might be regarded as paid-up stock, it was arranged that Bryan, who then held all the lands, should convey them to the company for the whole amount of the stock. This was done, and then he transferred the stock to Devlin in trust for all the subscribers for the $125,000. Of the stock,

20,000 shares were reserved for working capital, and the balance was distributed to the subscribers, 3,200 shares for each subscription of $5,000.

When a committee of the stockholders called upon Bryan to examine the titles to the lands, they did not inquire of him what they had cost him, but he exhibited to them the leases which had been assigned to him, in which the true consideration paid by him was not stated. He did not inform such committee, nor any of the *bona fide* subscribers, what the lands had cost, nor how much profits he and his three associates were to make by a sale of them to the company, but intentionally concealed these facts, well knowing that his scheme would be defeated if he disclosed them. After the organization the plaintiffs, and other stockholders, advanced money to the company to develop the lands and carry forward the operations of the company. For moneys thus advanced, the plaintiffs subsequently proceeded against the company, and sold lands of the company, and realized a portion of the money thus advanced. The plaintiffs did not discover the fraud which they claimed had been perpetrated upon them until after the death of Mr. Devlin; and before they commenced this action, they tendered to his executors a release of their stock in the company, and demanded of them the money which they had paid upon their subscriptions. Devlin, Arkenburgh, Bryan and Atwood divided the $64,500 between themselves, according to the agreement above mentioned which they had made for the division thereof. These facts stand clearly out in the case undisputed, and the question for us to determine is, whether upon them the plaintiffs are entitled to any relief, and if they are, what relief.

We have briefly this state of things: Devlin, Arkenburgh, Bryan and Atwood owned certain lands, situate in the State of Ohio, which had cost them, in round numbers, $30,000. They conceived the design of disposing of them to a company at a large advance, and dividing the profits between them, and for this purpose took steps to organize a company.

They procured the subscription paper to be drawn in which the subscribers agree to pay the sums set opposite their names "for the purchase of property" in Ohio, at the sum of $125,000. They subscribed the paper not intending to pay, and knowing they would not have to pay their subscriptions, and they then caused the paper to be circulated, and subscriptions to be procured, and for the purpose of filling up the subscription they gave away, in what may properly be called decoy subscriptions, about half of the amount to be subscribed. The plaintiffs subscribed upon the fraudulent assurance that the original cost of the land was $125,000, and upon the belief that they became subscribers on a footing of equality with all the others. The money subscribed was paid to Devlin, who acted as trustee for the subscribers, and also for his three associates. He retained his share, and the balance he paid over to Bryan, and by him it was divided among himself and the other two, and the four thus shared profits exceeding $30,000 in money, besides having as much stock as those who paid their subscriptions in cash.

I think there are several grounds upon which the plaintiffs can base a right of recovery in this action. The subscription paper itself contained, substantially, a representation that the subscribers were to purchase the lands in Ohio at a cost of $125,000. It imported a joint adventure for the purchase of the lands from persons, not subscribers, at the price named, in which all the subscribers were to be interested as purchasers upon the same footing, in proportion to their subscriptions. When the four defendants sent forth this paper with their names subscribed to it, they represented that they would pay the sums by them subscribed for the purchase of the land. No person reading the paper, and seeing their names to it as subscribers, would suppose that they had already bought the lands, and that they were really the sellers, and in no sense purchasers. The fair implication was that the lands were to be bought of the owners, and that such owners were not any of those who subscribed as purchasers. The natural inference which a party subscribing would draw

was that each was engaging in an enterprise for the mutual and common benefit and advantage of all, and that each had a common interest with the others, according to the amount of his subscription. Hence, when the four defendants put 'this paper in circulation, with their names subscribed to it for sums which they did not intend to pay, intending to palm off upon the subscribers real estate for $125,000, which cost them but $30,000, and if they succeeded fully in their scheme, thus dividing among themselves at least $90,000 in profits, they perpetrated a gross fraud upon every subscriber who was ignorant of the facts, for which they may in some form, upon the plainest principles, be held responsible.

There is another ground of liability. The subscribers to the paper agreed jointly and for their mutual benefit and advantage, to purchase certain lands, designated, for a price named. No one of the subscribers could, after this, purchase the lands for a less price and compel his associates to allow him more than he paid. His purchase would inure to the benefit of all the subscribers. That this is so, is so thoroughly settled, both upon principle and authority, that it will not be disputed. In all such cases, the subscribers enter into relations of trust and confidence with each other. They engage in a common enterprise for their mutual benefit, and have the right to demand and expect from their associates good faith in all that relates to their common interests. Equality and mutuality of burdens and benefits is implied in all such enterprises in proportion to the amounts subscribed, and no one of the subscribers can be permitted to take to himself a secret or separate advantage to the prejudice of his associates. If this be so as to a purchase made after the subscriptions are written, why should not the same rule be applied to a purchase made before? The wrong and breach of faith is just as great and every reason and authority showing that the rule should be applied in the one case would show that it should be applied in the other. *Bently v. Craven* (18 Bevan, 75) is an authority quite in point. There, one of several partners was employed to purchase

goods for the firm. He, unknown to his copartners, supplied the firm, at the then market price, with goods previously bought by himself for his individual business when the price was lower, and so made considerable profit. The master of the rolls held that the transaction could not be sustained and that he was accountable to the firm for the profits thus made. Hence, upon this theory, these four defendants, in dividing the large profit among themselves, perpetrated a fraud upon all the *bona fide* subscribers, for which they are accountable in some form.

But there is still another ground upon which the plaintiffs can base their right to recover, equally apparent. The four defendants had agreed among themselves to be jointly interested in the lands, and that they would put them into a company at a large price above their cost and divide the profits between them. In pursuance of this agreement they took measures to organize a company, and for that purpose had drawn up the subscription paper and signed it, and caused it to be circulated for subscribers. In this adventure of getting up the company, selling the lands and dividing the profits, they may be regarded as partners. It matters not that the title to the lands was not in all the partners, nor does it matter that there were no written articles of copartnership between them. Such a copartnership could be created by parol, and particularly after the partners have acted as such to the final termination of the adventure and divided the profits between them, they are certainly in no position to deny the existence of a valid copartnership. It was part of the business of this copartnership to get up this company and sell these lands to it; and all that one copartner did and represented while engaged in this business bound the others, and all are responsible for the false and fraudulent representations made by either in the same business. All these questions were discussed and decided in the case of *Chester* v. *Dickerson*, decided at the last March term of this Commission (*ante*, p. 1), and therefore need no further consideration at this time. Hence, the

four defendants are responsible for the false and fraudulent representations made by Atwood to induce Holcomb to subscribe. They must also be held responsible for the false representations made by Gifford to induce the plaintiffs, Getty and Amelung, to subscribe. He was not sworn, and it does not appear positively at whose instigation he acted. He was a son-in-law of Atwood and one of the persons to whom a subscription of $5,000 was given; at least, he subscribed and never paid; and yet his subscription was marked paid. He was engaged in procuring subscribers to the paper which the four defendants caused to be drawn, and he was at work in their interest and in the furtherance of their scheme, and they enjoyed the advantage of what he did. It is not too much, therefore, to hold upon these facts, unexplained and uncontradicted, that he was acting upon the employment or instigation of the four defendants or some one of them; and if he did, they are all responsible for his acts and misrepresentations.

I am, therefore, clearly of the opinion that the plaintiffs were entitled to relief in some form. They could not, on account of the fraud, recover back all the money paid by them, because they could not restore the four defendants to the position they were in before the transfer of the real estate to the company. The real consideration for the money subscribed and paid was the real estate which was conveyed to the company at the request of the subscribers. The company took the title to the real estate, and then their interest in the company and through it in the real estate was represented by shares of stock. The plaintiffs did not place the four defendants in the position they were before the real estate was conveyed, by returning their stock, because what the defendants parted with was the real estate, and that had passed beyond their control. The plaintiffs caused it to be seized and sold for their debts against the company, after the discovery by them of the fraud of which they complain. It is a rule, quite uniform, that a party who seeks to recover back money which he has

been induced to pay for property by fraud, must restore the property before he can rescind the contract of purchase and recover the money paid. And he must act promptly upon the discovery of the fraud. (*Cobb* v. *Hatfield*, 46 N. Y., 533; *Masson* v. *Bovet*, 1 Denio, 69; *Moyer* v. *Shoemaker*, 5 Barb., 319.) It matters not, so far as I can discern, that it is difficult or even impossible for him to do so, so long as he is not prevented by the act of the wrong-doer. Before he can adopt this form of remedy he must do it, and the action in such case may be at law. All the defrauded buyer has to do is to tender back what he has received, and then he can commence his action at law to recover the money paid. In this case, if the tender of the release of the stock was sufficient, no resort to equity was necessary or proper, as each one of the plaintiffs could at once, after the tender, have sued in an action at law to recover the amount of money paid by him. A joint action by all the plaintiffs would not have been proper. Hence, this action cannot be maintained for the recovery of the entire amounts paid by the plaintiffs, upon the theory that they have restored to the four defendants all that they parted with for plaintiff's money.

The plaintiffs could each have sued the defendants to recover damages for the fraud perpetrated upon him in procuring his subscription, and could, probably, have recovered the difference between the actual value of what he received and the amount paid by him. But such an action would have been a common-law action, to which each person or firm defrauded would be plaintiff, and the wrong-doers alone defendants.

This is not such an action. But I think, under the complaint in this action, the four defendants may be compelled to account for the profits they made upon the real estate, and which they fraudulently appropriated to the exclusion of their associates. The court can ascertain what the land actually cost the four defendants, and hold them to account for the balance. This balance equitably belongs to those who paid the money, and the plaintiffs can, in this action, recover their *pro rata* share thereof. It may be that the four defendants

should account for their own subscriptions as if paid, and also for such subscriptions as they gave away ; and it may also be that there should be a redistribution of the stock among the *bona fide* subscribers alone. But these matters of detail we do not determine; it is sufficient that the plaintiffs are entitled to some relief of the character indicated.

It matters not that the court at Special Term found all these transactions to be innocent and free from fraud. No finding of any court can change the character of the undisputed facts, and the vigilant eye of justice must have grown dim indeed if it cannot find some remedy for 'such a wrong.

The judgment must be reversed and new trial granted, costs to abide the event.

All concur, except LOTT, Ch. C., not sitting.

Judgment reversed.