(13 Misc. Rep. 574.)

LA FOLLETTE v. NOBLE et al.

(Superior Court of New York City, Special Term. July, 1895.)

RESCISSION OF CONTRACTS—WAIVER OF RIGHT.

Plaintiff entered into a contract to purchase from defendant the capital stock and franchises of a corporation for a certain sum, the contract to be closed at a specified time, on the payment of certain sums by plaintiff. Plaintiff took possession of the property at the time of making the contract, knowing that the business of the corporation was run at a loss, and at the specified time he made the cash payments. Afterwards he entered into a contract with a third person to sell the stock and franchises of the corporation at an advance on the price which he had agreed to pay to defendant. *Held,* that plaintiff elected to affirm the contract, and could not afterwards sue to rescind on the ground that he was induced to enter into it by the fraud of defendant.

Action by Harvey M. La Follette against William Noble and others to rescind a contract. A preliminary injunction was granted, and plaintiff now moves to continue the same. Denied.

The Mercury Publishing Company is a corporation created under the laws of the state of New York, August 4, 1894, and engaged in the business of printing and publishing the newspapers known as the Daily America and

Mercury, Sunday Mercury and America, and New York Mercury. Its capital stock is $500,000, divided into 5,000 shares of $100 each, of which 4,985 shares were owned by the defendant Cauldwell until the transfer to the defendant Noble hereinafter mentioned, and the remaining shares by friends of the said Cauldwell, who are alleged to be his employés. It is alleged that all the shares were originally issued to Cauldwell in consideration of the sale and transfer to the corporation by him of certain property and effects, consisting of type, printing presses, good will, accounts receivable, etc., theretofore owned by Cauldwell and used and employed by him in printing and publishing the aforesaid newspapers, in which business he had for many years prior to the organization of the corporation been engaged. On April 1, 1895, an agreement was made between Cauldwell, of the first part, and the plaintiff, of the second part, by the terms of which the plaintiff agreed to purchase from Cauldwell, and Cauldwell agreed to sell to the plaintiff, all the capital stock, with all the assets then owned by the company, including all franchises, especially United Press, for the agreed price of $130,000, to be paid as follows: On the signing of the contract $20,000, to wit, $5,000 in cash, and $15,000 in two notes of the plaintiff, one for $5,000, payable April 10, 1895, the other for $10,000, payable April 15, 1895, the payment of which notes was secured by the deposit of 50 first mortgage 6 per cent. gold bonds, of the par value of $1,000 each, of the La Follette Coal & Iron Company of Tennessee; and the balance, $110,000, on or before April 15, 1895, by four promissory notes of the plaintiff, to wit, one for $25,375, due three months from the date thereof; one for $25,750, due six months from its date; one for $31,350, due nine months after date; and the last for $31,850, due twelve months from its date; the excess over $110,000 of the total amount of said notes being represented by interest at the rate of 6 per cent. for the time at which the deferred payments should be made. Cauldwell was to hold and retain upon all the assets of the Mercury Publishing Company a chattel mortgage to be made by the corporation for $110,000 and interest, as collateral, until all the said notes were fully paid. The contract was to be closed on or at the option of the plaintiff on his paying the two notes for $5,-000 and $10,000, on giving one day's notice to Cauldwell before the 15th of April, 1895, at the office of the company; the contract to be adjusted and closed as of the 1st day of April, 1895, and publication of the papers from April 1st until the closing of the purchase to be for and on account of the plaintiff. La Follette paid the first two notes, aggregating $15,000, which, with the $5,000 previously paid, made $20,000, and subsequently advanced $7,000 to run the publications; but the balance of the purchase money, $110,-000, has never been paid. The plaintiff asserts that he was induced to enter into the contract by reason of misrepresentations made by the defendants concerning the condition and value of the plant agreed to be sold, and on the ground of fraud seeks to rescind the sale and to cancel and annul the contract between the parties and the chattel mortgage given thereunder; to obtain the return of the consideration moneys and advances aforesaid, with the securities deposited; and in the meantime to restrain the sale of said securities and the foreclosure of said chattel mortgage.

It appears that the defendant Noble made an exchange of properties with Cauldwell by the terms of which the 5,000 shares in the company were delivered to Noble, but subject to the existing contract between Cauldwell and La Follette. So that Cauldwell was at all times able to carry out his contract with the plaintiff. Upon making the contract the plaintiff was put in possession of the property, and it is conceded that at the time he took possession he knew that the expenses of the publications were from $700 to $1,-150 a week in excess of the income. The time for closing the contract was extended by agreement to April 25, 1895, on which day it was closed, and the payment of the notes was in like manner delayed until about that time. The old directors resigned, and those nominated by the plaintiff were put in their place. On June 3, 1895, La Follette entered into a contract with the defendant Ball, in which it is recited that the plaintiff, having control of the entire capital stock of the company, covenants and guaranties to Ball that he (the plaintiff) has procured an actual and bona fide agreement for the sale of the same with responsible parties for the sum of at least $187,000, which is to

be consummated by July 15, 1895. He also covenants and warrants that the entire indebtedness of the company, contracted and unpaid since April 1, 1895, does not exceed $7,000, exclusive of the amount due to William Noble, and for paper. The agreement further recites that the plaintiff has applied to Ball for pecuniary assistance; that Ball has agreed to advance him certain moneys to pay certain obligations in connection with the running of the paper; that for all sums so advanced Ball shall receive notes or acceptances of not over 60 days, indorsed by the company and the plaintiff and secured by bonds of the La Follette Coal & Iron Company of the par value of $12,-000, the same being deposited with Ball as collateral; and that all such notes, whether due or not, shall be paid forthwith out of the first payment made on account of the contemplated purchase of $187,000. Under this contract Ball made certain advances and received 4,975 shares of the company's stock and 12 bonds of the La Follette Coal & Iron Company. Ball received the money he advanced to the plaintiff from Noble, and was in a sense acting in the interest of the latter. On May 13, 1895, Thomas B. Kirby, Charles A. Ray, John P. Miller, and Eugene Davis, on behalf of a syndicate, called on the argument "the silver men," made a written offer to the plaintiff to purchase of the company its newspapers, franchises, and assets for the sum of $187,-000, which offer the plaintiff, in writing, accepted, and the purchase was then and there regarded as closed. The $187,000 was to be paid July 15, 1895, and this constituted the fund out of which the plaintiff evidently intended to reimburse Ball and to pay to Cauldwell the unpaid portion of the purchase money due to him in full satisfaction of the contract he held. Some arrangement was made on June 29th, with regard to omitting protest on the note for $25,375. On July 16th, after the dishonor of this note, defendants gave notice of their intention to foreclose the chattel mortgage and to sell the securities on account of the nonpayment of this obligation, the agreement providing that in case of the nonpayment of the notes hereinbefore referred to, or any of them, the chattel mortgage might be foreclosed and the securities disposed of. The plaintiff then took the position that he had been induced to enter into the sale by fraudulent misrepresentations. and on July 18 brought this action, claiming the relief aforesaid. He obtained a preliminary injunction, and the motion is to continue it pendente lite.

James B. Dill and D. W. Armstrong, for the motion.
John E. Parsons and C. H. Butler, opposed.

McADAM, J. It is apparent that when the plaintiff made the purchase he knew that the Mercury Publishing Company was not a paying concern, but was running at a loss of from $700 to $1,150 per week, and he evidently purchased with the idea that when he obtained control this result would in some manner be changed to his advantage. It is more than likely that he had in view the sale which he subsequently made to the syndicate known as "the silver men," by which he was to realize a profit of about $57,000. At all events he agreed to pay $130,000 for a newspaper which he knew would be a financial burden to run; and it is plain that he purchased the property knowing that without some good fortune or masterstroke of genius the concern must eventually involve him in heavy pecuniary loss. After events proved that his hopes and expectations must have rested with the silver men, in whom he seemed to have great confidence, for he obtained from them on May 14th the offer in writing for $187,000, which he on the same day accepted in writing. And that he sincerely believed the purchase would be consummated by the silver men appears in his contract with Ball, in which the plaintiff under his hand and seal declares "that he has procured an actual and bona fide agreement of sale of the same with responsible parties for the

sum of at least $187,000, and which is to be consummated by the 15th of July, 1895"; and Ball is promised a pro rata share of the profits for the assistance he was to render. If the silver men had consummated their contract, the plaintiff would certainly have completed his, for his profit depended upon that contingency. But the silver people defaulted; Ball did not get what was promised; the plaintiff was disappointed, and could not, with his meager capital, continue to carry his burden, much less pay the maturing obligations to Cauldwell, amounting to $110,000, with interest. He could do but one thing; that is, repudiate, and this solely on the ground of fraud, and could save his securities only on the theory of rescission. Assuming, but not deciding, that the plaintiff was induced to enter into the contract with Cauldwell through fraud, has he a right to rescind, and does it extend to invoking a court of equity to assist in the effort?

A party induced to part with his property on a fraudulent contract may, on discovering the fraud, avoid the contract and claim a return of what has been advanced upon it. Fraud destroys the contract ab initio, and the fraudulent purchaser has no title. But if the party defrauded would disaffirm the contract, he must do so at the earliest practicable moment after discovery of the cheat. This is the time to make his election, and it must be done promptly and unreservedly. He must not hesitate; nor can he be allowed to deal with the subject-matter of the contract and afterwards rescind it. The election is with him; he may affirm or disaffirm the contract, but he cannot do both; and if he concludes to abide by it, as upon the whole advantageous, he shall not afterwards be admitted to question its validity. Masson v. Bovet, 1 Denio, 69, 43 Am. Dec. 651, and notes; Wheaton v. Baker, 14 Barb. 597; Bartholomew v. Finnemore, 17 Barb. 429; Roth v. Palmer, 27 Barb. 654; Rich v. Bank, 3 Hun, 484, 5 Thomp. & C. 592; Getty v. Devlin, 54 N. Y. 415; White v. Dodds, 42 Barb. 565; Devendorf v. Beardsley, 23 Barb. 661; Sweetman v. Prince, 26 N. Y. 227; Pryor v. Foster, 130 N. Y. 171, 29 N. E. 123; Mayo v. Knowlton, 134 N. Y. at page 254, 31 N. E. 985. If a party who has the right to rescind a contract continues to treat the property as his own after discovery of the fraud, he will be considered to have elected to ratify it, and no action to disaffirm it will lie either at law or in equity. Shiffer v. Dietz, 83 N. Y. 300, 308; Grymes v. Sanders, 93 U. S. 55, 62. Pol. Cont. (Wald's Notes, p. 507) says:

"It is for the party defrauded to elect whether he will be bound. But, if he does affirm the contract, he must affirm it in all its terms. * * * When the contract is once affirmed, the election is completely determined; and for this purpose it is not necessary that the affirmation should be express. Any acts or conduct which unequivocally treat the contract as subsisting, after the facts giving the right to rescind have come to the knowledge of the party, will have the same effect. * * * A shareholder cannot repudiate his shares on the ground of misrepresentations in the prospectus, if he has paid a call without protest, or received a dividend after he has had in his hands a report showing to a reader of ordinary intelligence that the statements of the prospectus were not true, or if, after discovering the true state of things, he has taken an active part in the affairs of the company, or has affirmed his ownership of the shares by taking steps to sell them; and in general a party who voluntarily acts upon a contract which is voidable at his option, having knowledge of all the facts, cannot afterwards repudiate it if it turns out to his dis-

advantage. And, when the right of repudiation has once been waived by acting upon the contract as subsisting with knowledge of facts establishing a case of fraud, the subsequent discovery of further facts constituting a new incident in the fraud cannot revive it."

The defrauded party to a contract has but one election to rescind. If he once makes his election it is determined forever. Hence, if it is shown that he have at any time after knowledge of the fraud, either by express words or unequivocal acts, affirmed the contract, his election is irrevocable. Clough v. Railway Co., L. R. 7 Exch. 26. The plaintiff was in possession of the property from April 1 to July 16, 1895, and the attempted rescission on that day came too late. He had, with knowledge of the facts during the latter part of April and all of May and June, by his declarations and conduct asserted there was no fraud. It cannot be assumed that his purchase from Cauldwell at $130,000 was fraudulent, and his sale to the silver men of the same property at $187,000 honest. The plaintiff cannot claim that he attempted any fraud on the silver men; they might claim that, but not he. And if the sale to them at $187,000 was honest, it must follow, as "the night the day," that the sale from Cauldwell to him was untainted. If the sale to the plaintiff was fraudulent the property, in contemplation of law, was not his, but was in the vendor. He clearly did not elect to so consider it, for he guarantied to Ball on June 3d that he was the owner of the entire property, and he certainly dealt with it as his own on May 14, 1895, when he accepted the $187,000 offer from the silver men. Whether the indebtedness from the corporation to Cauldwell amounted to the sum at which Cauldwell put it is immaterial. The plaintiff agreed to pay $130,000, and the mode of payment is of no consequence. The corporation does not complain; it is not a party to the action. The plaintiff cannot complain for it, because he has taken the stand that the sale to him was fraudulent and void, and a void thing is no thing. He does not bring his action as a stockholder, but on the theory that he took nothing by his purchase, and that what he paid should be returned to him. He is not a judgment creditor of the corporation, and does not proceed as such, but on his private account and for his own individual benefit. One who seeks to have an instrument set aside as invalid cannot in the same action ask relief on the theory of any right which he can claim only if the instrument is valid. Such causes of action are inconsistent. Wilkinson v. Dobbie, 12 Blatchf. 298, Fed. Cas. No. 17,670.

The claim for equitable relief is not based on the insolvency of the defendants, who are conceded to be of ample pecuniary responsibity for any damage to the plaintiff's legal rights. It cannot be claimed therefore that irreparable damage will be done if injunctive relief is withheld. Indeed, it is a case where the granting of such relief might cause more damage to the defendants than the withholding of it would to the plaintiff; and under such circumstances the rule is to deny the relief prayed for. A newspaper must be run regularly or it is ruined. Neither advertisers, subscribers nor the general public will patronize a journalistic failure. Its name no longer attracts, but repulses. The failure to furnish the paper ac-

cording to promise does the property much more harm than the failure of a merchant to meet his obligations. To insure success it must be in the hands of those possessing the necessary capital and enterprise to push it in the line of journalistic prosperity. In the control of one running it at a loss he is unable to bear, awaiting the advent of prospective purchasers, whether they be the representatives of silver or gold, it is doomed to disaster. Nothing but luck, which seldom comes at the proper time, can save it. These remarks are called forth by the rule, before referred to, that where the continuance of the injunction may result in more harm than good it will not be continued, and by the further rule that where parties are of ample pecuniary responsibility the remedy should be sought in an action at law to recover damages for the wrong rather than by injunctive relief in equity.

For these reasons, the motion to continue the injunction will be denied, and the temporary injunction dissolved, with $10 costs.