McAdam, J.
It is apparent that when the plaintiff made the purchase he knew that the Mercury Publishing Company was not a paying concern, but was running at a loss of from $700 to-$1,150 per week, and he evidently purchased with the idea that when he obtained control this result would in some manner be changed to his advantage. It is more than likely that he had in view the sale which he subsequently made to the syndicate known as the “ silver men,” by which he was to realize a profit of about $57,000. At all events he agreed to pay $130,000 for a newspaper which he knew would be a financial burden to run ; and it is plain that he purchased the property knowing that without some good fortune or masterstroke of geniué the concern must eventually involve him in heavy pecuniary loss. After events proved that his hopes and expectations must have rested with the silver men, in whom he seemed to have great confidence, for he obtained from them on May 14 the offer in writing for $187,000, which he on the same day accepted in writing. And that he sincerely believed the pur-' chase would be consummated by the silver men appears in his contract with Ball, in which the plaintiff under his hand and seal declares “ that he has procured an actual and bona fide agreement of sale of the same with responsible parties for the sum of at least $187,000, and which is to be consummated by the fifteenth of July, 1895; ” and Ball is promised a pro rata share of the profits for the assistance he was to render. If the silver men had consummated their contract, the plaintiff would certainly have completed his, for his profit depended upon that contingency. But the silver people defaulted; Ball did not get what was promised; *126 plaintiff was disappointed, and could not, with his meager capital, continue to carry his burden, much less pay the maturing obligation to Cauldwell, amounting to $110,000, with interest. He could do but one thing, that is, repudiate, and this solely on the ground of fraud, and could save his securities only on the theory of rescission. Assuming, but not deciding, that the plaintiff was induced to enter into the contract with Cauldwell through fraud, has he a right to rescind, and does it extend to invoking a court of equity to assist in the effort? ”
A party induced to part with his property on a fraudulent contract may, on discovering the fraud, avoid the contract and claim a return of what has been advanced upon it. Fraud destroys the contract ab initia, and the fraudulent purchaser has no title. But if the party defrauded would disaffirm the contract, he must do scat the earliest practicable moment after discovery of the cheat. This is the time to make his election,-and it "must be done promptly and unreservedly. He must not hesitate ; nor can he be allowed to deal with the subject-matter of the contract and afterwards rescind it. The election is with him ; he may affirm or disaffirm the contract, but he cannot do both ; and if he concludes to abide by it, as upon the whole advantageous, he shall not afterwards be-permitted to question its validity. Masson v. Bovet, 1 Denio, 69, and notes; Wheaton v. Baker, 14 Barb. 597; Bartholomew v. Finnemore, 17 id. 429; Roth v. Palmer, 27 id. 654; Rich v. Bank, 3 Hun, 484; 5 Thomp. & C. 592; Getty v. Devlin, 54 N. Y. 415: White v. Dodds, 42 Barb. 565; Devendorf v. Beardsley, 23 id. 661; Sweetman v. Prince, 26 N. Y. 227; Pryor v. Foster, 130 id. 171; 41 St. Rep. 320; Mayo v. Knowlton, 134 N. Y. at page 254; 47 St. Rep. 748. If a party who has the right to rescind a contract continues to treat the property as his own after discovery of the fraud,, he will be considered to have elected to ratify it. and no action to disaffirm it will lie either at law or in equity. Shiffer v. Dietz, 83 N. Y. 300, 308; Grymes v. Sanders, 93 U. S. 55, 62. Pol. Cont. (Wald’s Notes, p. 507), says :
“ It is for the party defrauded to elect whether he will be bound. But, if he does affirm the contract, he must affirm it in all its, terms. * * * When the contract is once affirmed, the election is completely determined ; and for this purpose it is not necessary that the affirmation should be express. Any acts or conduct which unequivocally treat the contract as subsisting, after the facts giving the right to rescind have come to the knowledge of the-party, will have the same effect. * * * A,shareholder cannot repudiate his shares on the ground of misrepresentations in the prospectus, if he has paid a call without protest, or received a dividend after he has had in his hands a report showing to a reader of ordinary intelligence that the statements of the prospectus were-not true, or if, after discovering the true state of things, he has taken an active part in the affairs of the company, or has affirmed his ownership of the shares by taking steps to sell them ; and in general a party who voluntarily acts upon a contract which is voidable at his option, having knowledge of all the facts, cannot afterwards repudiate it if it turns out to his disadvantage. And. *127 when the right of repudiation has once been waived by acting upon the contract as subsisting with knowledge of facts establishing a case of fraud, the subsequent discovery of further facts constituting a new incident in the fraud cannot revive it.”
The defrauded party to a contract has but one election to rescind. If he once makes his election it is determined forever. Hence if it is shown that he have at any time after knowledge of the fraud, either by express words or unequivocal acts, affirmed the contract, his election is irrevocable. Clough v. Railway Co., Law Rep. 7 Exch. 26. The plaintiff was in possession of the property from April 1 to July 16, 1895, and the attempted recission on that day came too late. He had, with knowledge of the facts during the latter part of April and all of May and June, by his .declarations and conduct asserted there was no fraud. It cannot be assumed that his purchase from Cauldwell at $130,000 was fraudulent, and his sale to the silver men of the same property at $187,000 honest. The plaintiff cannot claim that he attempted any fraud on the silver men ; they might claim that, but not he. And if the sale to them at $187,000 was honest, it must follow, as “ the night the day,” that the sale from Cauldwell to him was untainted. If the sale to the plaintiff was fraudulent, the property, in the contemplation of law, was not his, but was in the vendor. He clearly did not elect to so consider it, for he guaranteed to Ball on June 3d that he was the owner of the entire property, and he certainly dealt with it as his own on May 14, 1895, when he accepted the $187,000 offer from the silver men. Whether the indebtedness from the corporation to Cauldwell amounted to the sum at-which Cauldwell put it is immaterial. The plaintiff agreed to pay $130,000, and the mode of payment is of no consequence. The corporation does not complain ; it is not a party to the action. The plaintiff cannot complain for it, because he has taken the stand that the sale to him was fraudulent and void, and a void thing is no thing. He does not bring his action as a stockholder, but on the theory that he took nothing by his purchase, and that what he paid should be returned to him. He is not a judgment creditor of the corporation, and does not proceed as such, but on his private account and for his own individual benefit. One who seeks to have an instrument set aside as invalid cannot in the same action ask relief on the theory of any right which he can claim only if the instrument is valid. Such causes of action are inconsistent. Wilkinson v. Dobbie, 12 Blatchf. 298, Fed. Cas. No. 17,670.
The claim for equitable relief is not based on the insolvency of the defendants, who are conceded to be of ample pecuniary responsibility.for any damage to the plaintiff’s legal rights. It cannot be claimed therefore that irreparable damage will be done if inj unctive relief is withheld. Indeed, it is a case where the granting of such relief might cause more damage to the defendants than the withholding of it would to the plaintiff; and under such circumstances the rule is to deny the relief prayed for. A newspaper must be run regularly or it is ruined. Neither advertisers, subscribers, nor the general public will patronize a journalistic *128 failure. Its name no longer attracts but repulses. The failure to furnish the paper according to promise does the property much more harm than the failure of a merchant to meet his obligations. To insure success it must be in the hands of those possessing the necessary capital and enterprise to push it in the line of journalistic prosperity. In the control of one running it at a loss he is unable to bear, awaiting the advent of prospective purchasers, whether they be the representatives of silver or gold, it is doomed to disaster. Nothing but luck, which seldom comes at the proper time, can save it. The remarks are called forth by the rule, before referred to, that where the continuance of the injunction may result in more harm than good it will not be continued, and by the further rule that where parties are of ample pecuniary responsibility the remedy should be sought in an action at law to recover damages for the wrong rather than by injunctive relief in equity.
For these reasons, the motion to continue the injunction will be denied, and the temporary injunction dissolved, with $10 costs.