JOHN A. SHUTTS

*v.*

UNITED BOX, BOARD AND PAPER COMPANY et al.

[Filed October 15th, 1904.]

A written agreement was made between bankers, as promoters, and a number of manufacturers of paper goods, as vendors, for the organization of a corporation, to which the properties of the vendors should be conveyed, fixing the rights of all the parties. A secret agreement was subsequently made by the promoters with a part of the vendors, which gave the latter an advantage and profit over the other vendors.—*Held*, that a bill for an accounting of such profits by one of the vendors, a party to the first agreement only, was not subject to demurrer for multifariousness for making all the vendors with whom the secret agreement was made, parties together with the corporation and the promoters.

On demurrer to bill.

*Mr. James E. Howell,* for the demurrant.

*Messrs. Griggs & Harding,* for the complainant.

EMERY, V. C.

This is a demurrer to a bill which discloses the following substantial facts: Dean & Shibley, bankers, as promoters, made a written agreement with twenty-five persons or corporations who were engaged in the manufacture of paper goods, as vendors, for the organization of a corporation to which the properties of the vendors were to be conveyed. The agreement fixed the method of ascertaining the values of the several properties, including an appraisal and arbitration, and also the method of payment, which was to be by preferred and common stock (in specific proportions) of the new corporation, to the amount of the valuation. The new company was to be protected against

15

mortgage liens and encumbrances on the properties of any of the vendors by the deposit of preferred stock issued to the vendor, amounting to one hundred and ten per cent. of the debt, and working capital was provided for the new corporation by an agreement that each vendor was to subscribe for preferred stock equal to ten per cent. of the valuation of its tangible property, as fixed under the agreement. The bankers were to procure the organization of a company with authority to complete the purchases and the issuance of stock under the agreement, and upon delivery to them by the corporation of the certificates of stock, which were to be issued in the names of the several vendors, they were to deliver to the several vendors the amounts to which they were entitled under the agreement. The agreement expressly recited in the preamble that the corporation was to be organized to carry out the plan of the agreement, and that the parties signing the agreement "mutually covenant and agree with one another," it being understood that the agreement was binding and operative "as between each of the vendors and the bankers, and also as between the several vendors." The agreement was to take effect as of January 1st, 1902, at which date valuations were considered to be made. The new company was organized on May 28th, 1902, with a capital stock of $1,000,000, and a board of directors, charged by the bill to be a "dummy" board, under the control of the promoters, on July 23d, 1902, increased the capital stock to $28,967,400—$14,949,900 being preferred and $14,018,500 being common stock. This increase of the stock was made for the purpose of carrying out the vendors' agreement. On July 24th, 1902, complainant signed the vendors' agreement, having been assured that twenty-four other vendors had also signed it, and, relying on the execution of this vendors' agreement, conveyed his plant to the company, receiving therefor shares of stock under the agreement—$18,903 in preferred and $23,794 in common stock. Complainant's bill charges that Dean & Shibley had previously entered into secret private agreements with fourteen of these vendors, securing to each of them, by separate agreement, terms of purchase different from the general vendors' agreement and more favorable. One of these

agreements—that with the defendants McEwan Brothers Company—is set out in the bill. It is dated January 2d, 1902, the date of the original vendors' agreement, recites the execution of that agreement, which is called the principal agreement, declares that it does not express the entire contract between the parties and agrees that this principal agreement shall be carried out only as modified by the second agreement. This agreement then fixes the price which these vendors are to receive for the conveyance of the properties as $375,000 in preferred stock and $300,000 in cash, to be paid by Dean & Shibley on the delivery of the conveyance, and the bankers agreed to pay $300,000 in cash for all the stock, preferred and common, issued in excess of $375,000 preferred stock, and the bankers also assumed the obligation of the vendors to subscribe for the preferred stock to be issued for working capital. The secret contracts made with the thirteen other vendors are alleged to be similar to the McEwan contract, and to be in form contracts with Dean & Shibley to purchase certain amounts of stock from each of these vendors. On July 24th, 1902, according to the bill, and before the transfer by any of the vendors to the corporation, the board of directors passed a resolution, assuming, on the part of the new company, all of these contracts of Dean & Shibley for the purchase of the stock of the company, amounting in the aggregate to $2,527,943.85, and issued promissory notes of the corporation to the several vendors for this aggregate amount. The notes were made directly to the vendors, and were either on demand or at thirty, sixty or ninety days. On October 20th, 1902, a first mortgage bond issue was authorized by the stockholders for $3,500,000, and was executed by the company to the Morton Trust Company. These bonds, to the extent of $1,-800,000, have been used to take up the notes given to the vendors under the secret agreements, and these vendors have also received in satisfaction or exchange for some portion of the notes additional preferred and common stock of the company issued for that purpose. It is also charged that one other vendor, the Traders' Paper Company, subsequently, and in 1903, claiming that a contract of similar character had been made with them

by Dean & Shibley, and that the new company was responsible for their contracts, received from the company mortgage bonds ($100,000), cash ($15,000) and preferred stock ($70,000), under this contract of Dean & Shibley. Complainant claims that these vendors and the promoters, by these secret agreements relating to the purchase of their properties, which were carried through by a dummy board of directors under the control of the promoters, have committed a fraud upon the company, and that they are liable in equity to account to the company for the amounts received under these agreements beyond the amounts fixed by the vendors' agreement.

It is also charged in the bill that at the time of assuming these contracts of Dean & Shibley for the purchase of stock the board of directors also passed a resolution allowing to Dean & Shibley the sum of $368,000, and it is charged that this sum was to be distributed through this firm to the promoters named in the bill (eighteen persons), or some of them, and a decree is prayed that this payment was fraudulent and void, and that Dean, the survivor of the firm of Dean & Shibley, be required to account to the company for it.

In the tenth paragraph of the bill there is a further allegation that by the provisions of the vendors' agreement the properties of all of the vendors were to be conveyed as of January 1st, 1902. The agreement (article 4) provides that the plant and property of each vendor, between that date and the date of transfer, is to be subject only to the ordinary fluctuations incident to the conduct of business. It is then alleged that the promoters, without complainant's knowledge or consent, conspiring with three of the vendors, permitted mortgages to be placed on their properties, between January 1st, 1902, and the date of their transfer to the company, as follows: The Wabash Paper Company, a mortgage for $200,000, with interest, March 1st, 1902; the Tytus-Gardner Paper and Manufacturing Company, a mortgage recorded May 14th, 1902, for $100,000, and the Peoria Straw Board Company, a mortgage dated February 1st, 1902. The latter company is also one of the vendors which is charged to have had one of the secret agreements above referred to. It is

charged that by permitting these mortgages to be given before the transfer the several mortgagees have obtained a secret advantage in violation of the vendors' agreement. Bonds of the new company have been issued for the purpose, among other things, of taking up the underlying liens on the property of the company, including these mortgages. These bonds, to the extent of $1,500,000, are now in the hands of the Morton Trust Company, one of the defendants, as trustees, and it is claimed by the bill that these mortgagors should pay off the mortgages given in violation of the agreement, and that the bonds of the new company, to the extent of $400,000, should be withdrawn.

The board of directors of the company are persons who have been parties to the issue of the notes, bonds and stock which is complained of, and it is alleged that it would be useless for the complainant to demand of the corporation that it should bring an action for an accounting against the promoters and the vendor companies who have made the agreements in violation of the vendors' agreement. The company is therefore made a defendant, as are all of the vendors who are alleged to have made the secret agreements or who have made the mortgages complained of. Shibley, one of the promoters, is dead, but Dean and seventeen other individuals, who are called the "promoters," are made defendants. These other defendants are officers of the vendor companies which are alleged to have profited by the secret agreements. The company demurs to the bill upon several grounds, which may, however, be classified under the general head of want of equity or multifariousness. The reason relied on at the argument and in the briefs is the ground of multifariousness. It is insisted that the claims to an accounting for the secret profits under this bill or for violation of the vendors' agreement, if well founded, are separate claims against each vendor who had a secret agreement and that each vendor must be separately called to account. This contention leaves out of view the facts that the fraud on the company under these secret agreements was made effective by the assumption by the company of the agreements made by Dean & Shibley, the promoters. They were parties to all of the agreements which were assumed,

and if the agreements are illegal, or if their assumption by the company was illegal, they are liable to the company for its losses on all the contracts, and perhaps primarily liable. If this view be correct it is not only proper, but necessary, that all the claims against Dean & Shibley arising out of the assumption of these secret agreements or other violations of the vendors' agreement should be included in a single suit against them, and the fact that separate defendants are interested in the several agreements with Dean & Shibley does not make the bill multifarious. The case of the company against Dean & Shibley for imposing their liabilities on the company by a single transaction or resolution is entire.

On the question of multifariousness raised by a defendant other than the company, the rule to be applied here would be that which was settled in *See v. Heppenheimer, 55 N. J. Eq. (10 Dick.) 240 (Vice-Chancellor Pitney, 1897)*; affirmed on appeal, for reasons stated, *56 N. J. Eq. (11 Dick.) 453*. In this case an issue of stocks and bonds of a company to the promoters was alleged to be a fraud on the company. The bill sought to hold the promoters liable and made parties all the holders of the bonds for the purpose of having them declared void. On the question of multifariousness raised by demurrer by two of the promoters, it was held (see *p. 243*) that it was not well founded, and that the demurring defendants were necessary parties in order that they might be bound by the litigation brought to determine (among other things) what was due upon the bonds. It is true, as argued by defendants' counsel, that this case involved to some extent the marshaling of the assets of an insolvent company by a receiver, but this aspect, as the court held, justified making stockholders as well as bondholders parties to a single suit for the purpose of ascertaining the separate liability of each by reason of the issue to a pool of promoters of stocks and bonds, without consideration. The basis of the decision, as I read it, was that all the parties to the illegal issue of the stock and bonds were proper parties to a single suit to determine the validity of the issue and the amount actually due on the bonds and stock. The case on this point is also analogous to the cases where

several persons claim separately under conveyances by a single judgment debtor, all of which are made in carrying out the debtor's scheme of fraud on his creditors. In these cases the objection of multifariousness, even when taken by a grantee of a portion of the property, is overruled. *Randolph* v. *Daly,* 16 *N. J. Eq. (1 C. E. Gr.) 313 (Chancellor Green, 1863)*; *Way* v. *Brogaw, 16 N. J. Eq. (1 C. E. Gr.) 213.*

In another aspect, also, all of these vendors should be joined in a single suit. The suit is substantially a suit to compel, on behalf of the company, the performance in good faith of the terms of the original agreement made by all of the vendors with each other, as well as with the bankers and promoters, for the ultimate benefit of the company as grantee. It is alleged that some of the vendors, by their control of the company and the directors, and in combination with the promoters, have secretly and fraudulently altered these terms and procured other terms more burdensome to the company and fraudulent as against the vendors, who made their conveyances solely on the terms of the original agreement. On a suit to enforce the original agreement, previous to the formation of the new company, all of the vendors, as well as the bankers, would have been necessary parties, either as parties defendant or complainant. The company, organized under the agreement to purchase, succeeds to the right to enforce it against the promoters, and all the vendors who have by fraudulent combination or collusion with the promoters secured secret profits are liable to an account to the company based on its rights under the agreement. These vendors are therefore, I think, all properly joined in a single suit with the individuals charged to be promoters. *1 Thomp. Corp.* § *474; Getty* v. *Devlin, 54 N. Y. 403, 413; S. C., 70 N. Y. 504.*

In the third place, the claims set up in this bill and upon which an accounting is asked, are all claims made in right of the company, and a decree in its favor upon equitable terms is asked against the other defendants. The multifariousness complained of exists, if at all, only in reference to the other defendants, and no objection on this account can be made by the company. *Miller* v. *Jamieson, 24 N. J. Eq. (9 C. E. Gr.) 41, 44*

(*Chancellor Runyon, 1873*) ; *2 Dan. Ch. Pr. (6th ed.) 827.*   On the whole case, as presented by the bill, I think the objection of multifariousness should not be sustained.

The objection of multifariousness is one often or largely of convenience in reference mainly to the trial of the cause, and in cases of this character it should be clear, I think, on the face of the bill, that the issues cannot properly be tried together in order that the objection may prevail at this stage of the cause. The other objections to the bill specified in the demurrer were not pressed at the hearing, and upon further examining them I conclude that they are not well founded, and the demurrer must therefore be overruled.