ROSE et al. v. MERCHANTS' TRUST CO.

(Supreme Court, Special Term, New York County. September 6, 1905.)

1. EQUITY—ANSWER—DEFENSE—REMEDY AT LAW.
In equity, the defense that an adequate remedy exists at law must be pleaded.
[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Equity, §§ 173, 174, 176.]

2. PARTIES—DEFECT—MODE OF OBJECTION—DEMURRER.
By the express provisions of Code Civ. Proc. § 488, a defect of parties appearing on the face of the complaint may be taken advantage of by demurrer.
[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Parties, § 115.]

3. SAME—ANSWER.
By the express provisions of Code Civ. Proc. § 498, a defect of parties, not appearing on the face of the complaint, is to be taken advantage of by answer.
[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Parties, § 115.]

4. SAME—WAIVER OF DEFECTS.
By the express provisions of Code Civ. Proc. § 499, a defect of parties, not taken advantage of by demurrer or answer, is waived.
[Ed. Note.—For cases in point, see vol. 37, .Cent. Dig. Parties, §§ 167, 170, 171.]

5. SALES—RESCISSION—PROOF OF DAMAGE.

One, who was induced to purchase bonds by fraudulent representations, might maintain an action for rescission without any showing of damage.

6. SAME—FRAUD—REMEDIES.

Where one has been induced by fraudulent representations to purchase property, on a discovery of the fraud he has a right to pursue either one of two alternatives, restore what he has received and claim restoration to his former position, or keep the property and sue for damages.

7. SAME—RESCISSION—EXERCISE OF RIGHT.

The right of a purchaser to rescind for fraudulent representations by the seller must be exercised immediately upon the discovery of the fraud.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Sales, § 313.]

8. CORPORATIONS—SALE OF BONDS—UNDERWRITING AGREEMENTS.

Defendant trust company, with which bonds were pledged, by fraudulent representations induced plaintiff to become a party to the underwriting of the bonds, which have been delivered to another trust company, which acted as the "syndicate manager," and which made a loan to the corporation issuing the bonds. On discovery of the fraud, plaintiff paid the syndicate manager for his bonds and tendered them to defendant. *Held*, that the payment to the syndicate manager did not amount to a ratification, precluding plaintiff from maintaining an action for rescission.

9. SAME—ACTION FOR RESCISSION—PARTIES.

The suit might be maintained against defendant alone, neither the syndicate manager nor the corporation issuing the bonds being necessary parties; it appearing that the bonds were held by defendant as security for a demand note with power of sale, and that defendant received the proceeds of the note.

10. SAME—FRAUD—EVIDENCE.

Where defendant trust company, which held the bonds of a corporation as collateral to secure a demand note, induced plaintiff to become a party to the underwriting of the bonds by concealing the fact of the pledge, by stating that the proceeds of the bonds were to be used for corporate improvements, when as a matter of fact they were to be used to liquidate a portion of the loan, and by falsely representing that the sale of the bonds at par had been practically closed, there was such fraud as justified rescission by plaintiff.

Action by William R. Rose and another against the Merchants' Trust Company. Judgment in favor of plaintiff.

Henry B. B. Stapler, for plaintiff.

CLARKE, J. Prior to 1901 there were in existence in Rutland, Vt., certain corporations, to wit, the Rutland Street Railway Company, the Chittenden Power Company, organized to acquire lands and build dams storage reservoirs, pipe lines, power stations, etc., for the manufacture and sale of electric power, and the People's Gaslight Company, with the right to furnish light and power, both by gas and electricity. An improvement of these properties had been attempted and engineered by one Burgett, who had organized the Vermont Electric Securities Company. Upon the securities of these companies, and especially the bonds of the Rutland Street Railway Company, the Merchants' Trust Company had advanced by way of loans very considerable sums of money. It had sent as its agent to Rutland almost continuously throughout 1901 one Paul M. Mowry, who was and had been regularly employed by it on a salary as electrical expert and adviser on such enterprises as

it was loaning money to, to inform it as to the properties and to see that the moneys loaned by the defendant were used for the purposes advanced, to wit, the improvement of these properties. By the spring of 1902 the Merchants' Trust Company had advanced to this enterprise not far from $600,000. Among other collateral security it held, upon the usual form of collateral stock notes, $418,000 of the bonds of the Rutland Street Railway. The Burgett scheme of a holding company proved a failure. As was testified, it was put an end to before the courts took a hand. A new corporation, known as the Chittenden Development Company, was organized under the laws of the state of New York, with an authorized capital of $100,000, to take over these properties, their obligations and contracts. As testified to by Mr. Tuttle, one of its incorporators:

"The Chittenden Development Company was organized really to take the place of the Vermont Electric Securities Company. It was a kind of a holding company. When it was organized, agreements were entered into whereby the Chittenden Development Company purchased from the Vermont Securities Company all right, title, and interest in and to the bonds and stocks which that company held of the three Rutland companies. The Merchants' Trust Company consented to the change of ownership, that the Chittenden Development Company might step into the shoes of the Vermont Electric Securities Company and be the debtor."

The certificate of incorporation of the Chittenden Development Company was filed April 7, 1902, and the first meeting of incorporators for organization was on May 12, 1902. The incorporators were Paul M. Mowry, the employé of the defendant hereinbefore alluded to, Ezra A. Tuttle, and his law partner, Charles N. Flint, the attorneys of the defendant. The new corporation was given office room in the law office of said attorneys. At the first meeting of the board of directors Mowry was elected president, Flint secretary, and John B. Grant, the secretary of the Merchants' Trust Company, treasurer. At the same meeting $800 was paid in by Mowry for the eight shares of stock issued to him, and $100 each by Flint and Tuttle for one share issued to each of them, which sums made up the $1,000 required by the certificate of incorporation to enable the company to commence business, and immediately the bill of Mowry for $1,085, for incorporating expenses, was approved and ordered paid. At the same meeting the board authorized contracts with the Vermont Electric Securities Company in relation to stock and bonds of the Rutland Street Railway Company, and to stock and bonds of the Chittenden Power Company, assuming the liabilities and agreeing to carry on the contracts of said companies. It also agreed to purchase from one Morhaus $100,000 of the bonds of the People's Gaslight Company for $99,000 shares of the capital stock of the Chittenden Development Company, being its entire capital stock, less the 10 shares required to qualify directors. The certificate for said 990 shares was on May 12, 1902, issued to K. C. Morhaus. It was by him indorsed to Ronald K. Brown, the brother-in-law of Mr. Langdon, the president of the Merchants' Trust Company. Mr. Brown was one of the attorneys of the trust company. He succeeded Mowry as president of the Chittenden Development Company. He testified that he paid nothing for the 990 shares of his company's stock, that Mr. Langdon asked him to have the stock put in his name, and that he did not know whom, as

owner of record, he represented, or who was the real owner of the stock. At this same meeting the board resolved for $30,000 shares of the capital stock of the People's Gaslight Company to take up the note of the Vermont Electric Securities Company to the Merchants' Trust Company, dated June 25, 1901, for $24,000, with interest. At the next meeting of the board on June 17, 1902, it was resolved that the company make its note to the Merchants' Trust Company for $547,379.59, for principal and interest, to take up the promissory notes given by Henry W. Burgett, the Vermont Securities Company, and the Chittenden Development Company at various times heretofore on the following collateral: $300,000 Chittenden Power Company bonds, $970,000 Chittenden Power Company stock, $418,000 Rutland Street Railway Company bonds, $577,800 Rutland Street Railway Company stock, $100,000 People's Gaslight Company bonds, $70,000 People's Gaslight Company stock, and also its promissory note to the Merchants' Trust Company for $24,572 to take up the note of the Vermont Electric Securities Company for $24,000 and interest on same collateral. Thus the indebtedness was turned over and the new company became debtor to the Merchants' Trust Company in the sum of $571,951.59, secured by the same collateral which was already in the possession of the Merchants' Trust Company. At this same meeting Brown became president instead of Mowry, and Charles J. Theuner, an employé of the Central National Bank, of which Mr. Langdon was also president, became treasurer, instead of Grant. Subsequently the mortgage on the Rutland Street Railway Company, by consent of all parties, was increased from $500,000 to $1,000,000, $500,000 of the bonds being deposited in lieu of the $418,000 held by the defendant, and the railway company agreed to give $158,000 of the new bonds and $500,000 of its stock as additional compensation to the Chittenden Development Company for building an extension to its road. This $158,000 of bonds were also pledged as collateral with the Merchants' Trust Company, making the total of $658,000 held by it as collateral security to notes given by the Chittenden Development Company at the time of the events which are the subject-matter of this suit. By the end of September, 1902, the Chittenden Development Company was indebted to the Merchants' Trust Company in about $800,000. The capital of the Merchants' Trust Company was $500,000, its surplus $300,000. It had two other loans outstanding, aggregating about $800,000 each—one to the Richmond enterprise and the other to the Hudson Valley enterprise. The plaintiffs are attorneys at law in this city, and kept deposit accounts and had other business relations with the defendant, which is a trust company. Mr. Putzel had a personal acquaintance with Mr. Langdon, its president, who introduced Mr. Mowry to him, and told him that Mowry was there to take charge of getting business for the company in the way of securing corporate enterprises which they were to float or handle, and get them to become trustees on trust mortgages, and all business of that character usually done by a trust company.

The conclusion reached by me from all the evidence is that Mowry is to be regarded as the duly authorized agent of the defendant in the transaction at bar. In September, 1902, Mowry had an interview with Mr. Putzel. He said he had come on behalf of the Merchants' Trust

Company to interest Putzel in a syndicate which the trust company was getting up for the purpose of underwriting the bonds of the Rutland Street Railway Company that were owned by the Chittenden Development Company; that the trust company and its directors were going to become underwriters themselves to this syndicate; and that there was a little of it left, and they offered him some of it—$50,000— to evidence their appreciation of the kindness he (Putzel) had shown them from time to time.    Mowry said that the Rutland Street Railway Company was a road in actual operation at Rutland, Vt., running a certain number of miles of road; that there was also there a gas company and a power company, and that the Chittenden Development Company was developing those enterprises; that they owned practically, and controlled practically, all of the stocks and bonds of the Rutland Street Railway Company, of the gas company, and of the power company; that at that time the Chittenden Development Company was introducing various betterments by the way of rolling stock, etc.; that was their contract to do these things, and they were actually working at it at that time; that they intended to extend the lines of the road, so that they would reach points which would afford very considerable increase of traffic to the company; that they also intended to develop the power company, so that the street railway company would get its power directly from this power company, which was controlled by the Chittenden Development Company; that they needed $510,000 for the purpose of making all these improvements and betterments to the road and of improving the rolling stock and extending the lines, perfecting the power so that they could have their own power.    He said:

"Here is the underwriting agreement. You can read that, and read all about these companies in there and the statement I am giving you now."

He said, further:

"You never will be called upon for this money, because we have practically perfected our negotiations for a sale of these bonds, and you are going to get a profit of $7,500 within a few weeks, and you will get $50,000 worth of stock, and the stock will be good when these improvements are all made, because the stock will pay a dividend beyond question."

He said that he had practically closed—perfected—the negotiations for the sale of those bonds at par.    They were to be underwritten at 85. He called Mr. Putzel's attention to the point that, before the Merchants' Trust Company would undertake to bring out any such syndicate agreement as this, they had satisfied themselves in the first place that the property itself was an excellent proposition, they had sent their experts up there, they had got all the particulars concerning it, and they were absolutely satisfied that the company was being equipped in the most modern improved way, and that the traffic which the Rutland Street Railway Company would get would be so great that the stock would pay a dividend; that they would not for a moment touch a thing of this kind unless they had made this previous examination, and their own directors were so satisfied that this property was in this condition that they themselves had taken up with the Merchants' Trust Company nearly all of the underwriting.    As matter of fact, before Putzel signed the paper the Merchants' Trust Company had signed, as well as a large number of its directors.    Mr. Putzel testified that he relied upon the truth of the

statements contained in the prospectus, that he would not have signed had he not believed in the truth of those statements, that he signed the agreement relying on the statements made by Mowry, and that he absolutely believed those statements to be true. He testified that he did not know that the bonds of the Rutland Street Railway Company were held as collateral to a loan by the defendant; that it held in pledge a very large part of all the property of the Chittenden Development Company; nor did he know that the Chittenden Development Company was in debt to defendant in upwards of $600,000; nor that the Rutland Street Railway Company was indebted to the Merchants' Trust Company.

The syndicate agreement, after reciting the purposes of the incorporation of the Chittenden Development Company, states:

"It has entered into various contracts with the above-mentioned companies for the improvement, extension, completion, and betterment of the several properties, and has up to August 1, 1902, invested in excess of $700,000 in this work."

It then recites its ownership of the stock and bonds of the various companies and proceeds:

"Whereas, the ownership of the above securities gives to the Chittenden Development Company the absolute management and control of the above-mentioned properties; and whereas, the Chittenden Development Company requires the sum of about $510,000 to complete its contracts with the above-mentioned companies to extend, develop, and operate the properties; and whereas, it is considered desirable and expedient that the Chittenden Development Company shall temporarily procure the said sum of $510,000 as a loan on its corporate promissory note or notes secured by $600,000 par value of Rutland Street Railway Company first mortgage bonds deposited as collateral security to said note or notes; and whereas, it is necessary that the value of said securities shall be established and guarantied by an underwriting syndicate of responsible subscribers, agreeing to take and pay for said securities on or before the maturity date of said promissory note or notes: * * * This agreement * * * between the Chittenden Development Company and the several persons, etc., whose signatures are annexed, parties of the second part, and the Knickerbocker Trust Company, hereinafter called the 'Syndicate Manager,' party of the third part, witnesseth: * * * That the Chittenden Development Company is the owner of and has sold and hereby agrees to deliver to the Syndicate Manager, upon demand therefor, the number of Rutland Street Railway first mortgage bonds set opposite the signatures of the subscribers, together with an amount of the capital stock of the Rutland Street Railway Company equal to 100 per cent. of the par value of said bonds at the price of 85 per cent. of the par value of said bonds. This each of the subscribers, for himself only, and not for any or either of the others, hereby agrees to and with the parties hereto and with the subscribers to purchase and take and pay for on March 1, 1903, or thereafter, on demand of the Syndicate Manager, so much of the $600,000 of the first mortgage bonds of the Rutland Street Railway Company as is set opposite their respective signatures, together with an equal amount of the capital stock of the Rutland Street Railway Company equal to 100 per cent. of the par value of said bonds, at the price of 85 per cent. of the par value of said bonds. That each of the subscribers agrees that the Chittenden Development Company or the Rutland Street Railway Company may borrow on the promissory notes of either company such sums as either of said companies shall require for the construction and equipment and extensions, development, and operation of any of the above-mentioned properties, not exceeding in the aggregate the sum of $510,000."

And that, if said companies failed to pay, the subscribers agreed to pay their proportionate share.

The subscribers agreed that the bonds and stock should be deposited as collateral to any notes given by the said companies. There was a further provision for an extension to September 1, 1903. This agreement was signed: Chittenden Development Company, by Ronald K. Brown, President. Attest: C. J. Theuner, Treasurer. Rutland Street Railway Company, P. M. Mowry, Vice President. Attest: C. H. West—and by the Knickerbocker Trust Company. The subscribers included Edwin Langdon, president of the Merchants' Trust Company, John B. Grant, its secretary, and former treasurer of the Chittenden Development Company; P. M. Mowry, the employé of the Merchants' Trust Company and former president of Chittenden Development Company, and a large number of the directors of the Merchants' Trust Company. The plaintiffs subscribed for $50,000. At the time Mowry had his conversation with Mr. Putzel he was not connected with the Chittenden Development Company as an officer or director, but he was the salaried employé of the Merchants' Trust Company. On October 8, 1902, the underwriting syndicate having been completed, there was delivered to the Knickerbocker Trust Company $600,000 of the bonds and $600,000 of the stock of the Rutland Street Railway Company, which had theretofore been in the possession of the Merchants' Trust Company as collateral to the loans made by it to the Chittenden Development Company, and the underwriting agreement, and on that collateral the Knickerbocker Trust Company loaned to the Chittenden Development Company $510,000. Of this the Chittenden Development Company paid to the Knickerbocker $10,200 for its services as syndicate manager, and the balance, $499,800, it delivered to the Merchants' Trust Company. The loans of said company to the Chittenden Development Company on October 10, 1902, aggregated $799,451.59. To this account the $499,800 was credited. At the expiration of the extended time of the syndicate agreement the subscribers were called upon by the Knickerbocker Trust Company to make good their agreement. Mr. Putzel, having received certain information, had an interview with Mr. Langdon, the president of the Merchants' Trust Company, claimed that he had been deceived, and asked to be relieved of his subscription. This request was refused. At the time of this conversation the plaintiffs had not paid their money and received the bonds and stock. Subsequent thereto the plaintiffs paid to the Knickerbocker Trust Company the amount of their subscription, $43,775, received the bonds and stock, and promptly made a tender to and demand upon the defendant. This tender they renewed in open court upon the trial. It was established that all of the other subscribers had made good their subscriptions, and no demand similar to plaintiffs' had been made by any of them. It was also established that the Rutland Street Railway Company had not defaulted on the bonds, but that all the interest coupons had been paid on presentation. The plaintiffs had not presented their coupons, but tendered the bonds and coupons as received by them.

This is an action in equity, and the relief demanded is: (1) That the plaintiffs' agreement to underwrite and purchase bonds and stock be declared null and void as against the defendant. (2) That the defendant relieve the plaintiffs from their purchase of said bonds, and that it accept the same from the plaintiffs and pay to them the sum of

$43,775, with interest thereon from October 8, 1903, to the end that the plaintiffs may be restored as nearly as may be to the position in which they were before signing the aforesaid agreement to purchase such bonds and stock. Defendant asks for a dismissal upon the ground that there exists an adequate remedy at law, to wit, an action for damages for deceit. But he has pleaded no such defense. "A defendant, when sued in equity, cannot avail himself of the defense that an adequate remedy at law exists unless he pleads that defense in his answer. Town of Mentz v. Cook, 108 N. Y. 504, 15 N. E. 541, and authorities there cited." Rooney v. Bodkin, 93 App. Div. 431, 87 N. Y. Supp. 800. It also asks for a dismissal upon the ground that there is a defect of parties, in that the parties to the agreement have not been made parties to this action. But the alleged defects appear upon the face of the complaint. Under sections 488, 498, 499, of the Code, such objection must be taken by demurrer if the defect appears upon the face of the complaint and by answer if it does not, and if not so taken the objection is waived. No demurrer has been interposed, and no such question raised by the answer. The cases cited by defendant have no application. They turn upon section 452 of the Code:

"The court may determine the controversy as between the parties before it, when it can do so without prejudice to the rights of others, or by saving their rights, but where a complete determination of the controversy cannot be had without the presence of the other parties the court must direct them to be brought in."

No such situation is presented by the case at bar. So far as the Knickerbocker Trust Company is concerned, plaintiffs have no controversy with it. They agreed to pay to it the amount agreed upon when called upon. They had no other dealings with it than to pay the sum which they were obligated to, which they did. They do not ask an annulment of the entire underwriting agreement. It has been executed by all the other parties. They only ask its annulment so far as they are concerned. As to the Chittenden Development Company no cause of action is stated against it and no relief demanded against it, nor does it appear how it can be affected by a decree requiring the defendant to take back the bonds it had in its possession when the acts complained of took place, and who received the moneys whose return is demanded. No reason appears why the court may not "determine the controversy as between the parties before it without prejudice to the rights of others." While the evidence shows that the Chittenden Development Company had knowledge of and participated in the transactions complained of, it is not on that account a necessary party to this action. The general principle that there can be no contribution between wrongdoers, that each is liable for all the wrongful acts in which he participated, is well established both at law and in equity. Defendant further asks for a dismissal upon the ground of the absence of any proof showing that plaintiffs have been damaged, stating the rule to be that, in action in equity as well as at law, parties have no right to recover on the theory of false and fraudulent representations unless they have thereby been injured. In support of this proposition it cites two General Term Decisions, Aron v. De Castro, (Sup.) 13 N. Y. Supp. 372, in this department in 1891, and Hewlett

v. Saratoga Carlsbad Spring Co., 84 Hun, 248, 32 N. Y. Supp. 697,. in the Third Department in 1895, following the Aron Case. But in Mack v. Latta, 83 App. Div. 242, 82 N. Y. Supp. 130, decided in May, 1903, Mr. Justice Ingraham, speaking for the court, said:

"It would seem to follow that if those representations were false, and made for the purpose of inducing the plaintiff to subscribe to the stock of the company. and upon the faith of which he did subscribe, he would be entitled to rescind the subscription and to recover from the defendant corporation the amount that he paid thereon. Whether the stock was worth the amount that he subscribed for it or not would be immaterial upon this question. What he subscribed for was stock in a corporation having the advantages that these representations, if true, would give to it, and if these representations were untrue, and the corporation was not what it was represented to be, the plaintiff would be entitled to have the subscription canceled. I do not understand that in such an action it is necessary to allege that the stock was not of the value that it was when the plaintiff made the subscription, for it is not the damages sustained by reason of the fraud that is sought to be recovered from the corporation. The question is whether the plaintiff is entitled to rescind a subscription to stock induced by representations as to the condition of the company, and which related to its prospects, when these representations were false and fraudulent. I think, therefore, that the facts alleged in the complaint were sufficient to establish a good cause of action which entitled the plaintiff to the relief demanded as against the corporation."

The Court of Appeals in the same case (178 N. Y. 525, 71 N. E. 97),. referring to another case cited, said:

"That case is authority for the maintenance of this action against the defendant corporation, and accords with the opinion of the Appellate Division in this case, which holds, upon reasoning which we heartily approve, that the complaint states a good cause of action against the defendant corporation for· a rescission of the contract and for judgment against it, canceling the sub-scription and awarding the plaintiff the. $100,000 paid by him, with interest."

The defendant also claims a dismissal upon the ground that the payment for the bonds in question, with knowledge of the alleged false· and fraudulent representations, waived the right of the plaintiffs to rescission and left them solely to their action for damages. The proof does establish the fact that before the plaintiffs paid for and received the bonds in question they had discovered the facts upon which they now claim a rescission. The rule is perfectly clear and well established that upon a discovery of the fraud plaintiff has a right to pursue· either one of two alternatives, viz., either to restore what he had received and claim restoration to the position occupied before the agreement, or keep what he had received and prosecute the defendant for the damages alleged to have been sustained thereby. He cannot prosecute· both remedies, as they are inconsistent with each other. The right to· rescind must be exercised immediately upon the discovery of the fraud, and any delay in doing so, or the continued employment, use, and occupation of the property received under the contract, will be deemed an· election to affirm it. Strong v. Strong, 102 N. Y. 69, 5 N. E. 799. A vendee entitled to rescind a sale for fraud must act promptly on discovering the fraud, and restore or offer to restore the property. By dealing with it as owner after such discovery he deprives himself of· this remedy. Schiffer v. Dietz, 83 N. Y. 300. He was required not only to prove the alleged fraud, but also to explain why the acceptance of the property purchased did not preclude him from raising the ques--

tion. If he delays acting and retains the property delivered beyond a reasonable time to act, or accepts performance after such discovery, he is held to have ratified the contract and waived his objections thereto. Baird v. Mayor, etc., 96 N. Y. 567. If after knowledge of the fraud a party, so situated, proceeds in recognition or affirmance of his contract, he, as a general rule, is deemed to have ratified it, and is denied such remedy or relief, and his right of action resting in the fraud for its support is only for damages occasioned by it. Myers v. King, 48 Hun, 106. But the same case says: "The question of affirmance depends upon circumstances."

In the case at bar, if the contract had been directly with the Merchants' Trust Company, and if after the discovery of the alleged fraud the plaintiffs had paid to that company the amount agreed upon and had received from it the bonds and stock, I have no doubt the rule invoked would apply and that rescission would be denied. But the contract was not made with the Merchants' Trust Company. The contract was to pay to the Knickerbocker Trust Company upon demand by it the price of the bonds. The plaintiffs make no claim that the Knickerbocker Trust Company was a party to the fraud. They had no dealings with it. No representations were made by it. The agreement provided that on the strength of the underwriting, and with the bonds and stock as collateral to be held by it, it might loan to the Chittenden Development Company $510,000. Upon the strength of this underwriting, not obtained by it, but obtained by the defendant by its representations, and with the bonds and stock as collateral, it did advance its own money to the Chittenden Development Company, which, as a part of the scheme, as claimed by plaintiffs, handed it over to the defendant to apply to the payment pro tanto of its existing indebtedness. The Knickerbocker Trust Company is an innocent third party, which parted with money upon the genuine signature of plaintiffs promising to pay. Though induced by fraud, plaintiff's contract was not void, but voidable only. And it does not seem to me that they would have had a defense as against the innocent third party to an action by it upon that contract upon the faith of which it had acted. There is no question here of delay, or of use, or of failure to make tender, or ability to restore. Immediately upon discovery of the facts, plaintiffs notified defendant and asked to be relieved. They then carried out their contract with the Knickerbocker Trust Company, paid their money, and received the bonds and stock, which they immediately tendered to defendant. They had not realized upon the coupons, but in open court tendered the bonds and stock in the original shape as received, demonstrating their ability to restore the status quo. If it be true that "the question of affirmance depends upon circumstances," a case could hardly be conceived where as between the parties to this action affirmance was more clearly negatived. The Knickerbocker Trust Company was not the agent of the defendant. It held the bonds of plaintiffs subject to be paid for and received by them when called upon, with the right to hold them as collateral for moneys advanced upon them and plaintiffs' promise. The Merchants' Trust Company had lost all control over them, so that neither directly nor indirectly did the payment to the Knickerbocker,

after knowledge, fall within the rule of ratification so far as the defendant was concerned.

The proof, in my opinion, establishes: That the defendant, having become involved in the loaning of money to the Rutland enterprises to the extent of nearly $600,000, through its employés, agents, and attorneys, organized the Chittenden Development Company as a mere tool or dummy to go on with the work under this cover; that said company had no capital whatever; that the scheme for raising money was the scheme of the defendant for the primary purpose of reducing its own loan; that the statements in the underwriting agreement and in the statements made to plaintiffs were made with intention to deceive and procure signatures, and that its concealment of material facts which in good faith it ought to have disclosed were fraudulent; that its own signature to the underwriting was with intent to deceive by holding out the impression that it regarded the bonds as desirable purchases, while as matter of fact it practically owned them and was anxiously engaged in disposing of the same; that the statement that the Chittenden Company had expended $700,000, while as matter of fact it had assumed an indebtedness to the defendant of $571,951.59 and had borrowed some $300,000 more, was false in fact and in intention. The statement that the Chittenden Development Company was in the sole ownership and control of the bonds and stock of the constituent or subordinate companies, while, as matter of fact every bond and share of stock was pledged with the defendant as collateral for prior indebtedness, was a concealment or perversion of the facts intended and calculated to deceive; that the statement of the purposes for which the $510,000 was to be raised was a false representation, as it was intended to be and was actually used to, in part, liquidate a prior indebtedness; that the statement that the sale of the bonds at par had been practically closed was not a statement of a future hope, but the statement of an existing condition of fact which was fraudulent and false and stated with an intention to deceive; that the subscription itself was made for the same purpose and that the entire concealment of the fact of the possession of the $600,000 bonds upon collateral stock notes, with power of sale, while giving out that the company was undertaking to sell them for the Chittenden Company, was so material a concealment that in and of itself it afforded ground for this action, and that the foregoing facts and the appropriation of the amount raised to its own use in applying it to the payment of its own indebtedness—all amply warrant the action, and require the decision of the court granting a rescission of the contract as between the plaintiffs and the defendant. The action will lie against the defendant according to the following authorities: By reason of the concealment of the interest of the defendant (Getty v. Devlin, 54 N. Y. 403; Carr v. Nat. Bank & Loan Co., 167 N. Y. 375, 60 N. E. 649, 82 Am. St. Rep. 725; Conkey v. Brud, 36 N. Y. 427); for the false representations as indicated (Talmadge v. Sanitary Security Co., 31 App. Div. 498, 52 N. Y. Supp. 139); for the diversion of the property from the specified object (Slayback v. Raymond, 93 App. Div. 326, 87 N. Y. Supp. 931). Having received and retained the proceeds this defendant, which by the representations and concealment set forth procured the plaintiffs' signature to the agreement and subsequent payment of the

moneys, is simply liable to the defrauded plaintiffs in this action for rescission.

The case of Cohen v. Ellis, 16 Abb. N. C. 320, holds that where the possession by the defendant of the proceeds of a fraudulent sale is alleged and established, a suit in equity for restitution is properly brought against that party to the agreement alone who received and retained the moneys—the fruit of the fraud. The bonds in suit were held by the defendant in pledge as collateral security under a demand note for $547,000, with power of sale at public or private sale, without notice to the Chittenden Development Company. The evidence shows that the Chittenden Development Company had notice and consented to a sale by the defendant. Therefore the transaction is the same as though the defendant had sold the bonds on the Exchange under the power of sale. The fraudulent transaction complained of is in the very sale of those bonds to the plaintiffs, in which sale the defendant was necessarily the principal. Under such circumstances the action of rescission may be brought against the real principal in the transaction alone.

My conclusion is that plaintiffs are entitled to the relief demanded in the complaint, with costs. Submit findings, etc., on notice.