## HECKSCHER v. EDENBORN.

(Supreme Court, Appellate Division, Second Department. March 12, 1909.)

CORPORATIONS (§ 80*)—SUBSCRIPTIONS TO STOCK—CONSTRUCTIVE FRAUD.

    A syndicate agreement provided for the purchase of the stock of an existing corporation at par and coal lands, and for the erection of coke ovens and blast furnaces, and for the sale of the property to a new corporation whose stock should be issued to the syndicate subscribers. The property was purchased, the new corporation was organized to which the property was transferred, and the stock was issued to the subscribers. A stockholder of the existing corporation purchased the stock thereof as agent of the syndicate. There was nothing to show actual fraud on his part in the transaction. *Held*, that a suit by a syndicate subscriber against such stockholder would not lie for fraud, the evidence not showing constructive fraud (per Woodward, J.); and, second, because his constructive fraud, if any, was a fraud on the new corporation, and the subscriber's action, if any, was a representative action (per Miller and Jenks, JJ.).

    [Ed. Note.—For other cases, see Corporations, Dec. Dig. § 80.*]

    Gaynor, J., dissenting.

Appeal from Trial Term, Suffolk County.

Action by August Heckscher against William Edenborn. From a judgment for plaintiff entered on the decision of the court without a jury, defendant appeals. Reversed.

Argued before WOODWARD, JENKS, GAYNOR, and MILLER, JJ.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
    115 N.Y.S.—43

Frederic B. Jennings (Charles MacVeagh and Allen Wardwell, on the brief), for appellant.

Henry Wollman (Timothy M. Griffing and Edward S. Seidman, on the brief), for respondent.

WOODWARD, J. This is an action at law, tried by the court, a jury having been waived, to recover, as moneys had and received, the amounts paid by the plaintiff and his assignors for certain stock in the Sheffield Coal & Iron Company in pursuance of their subscriptions to a syndicate agreement which they claim to have rescinded. The learned trial court has made 96 findings of fact and 20 conclusions of law sustaining the plaintiff's contention, and awarding judgment for the full amount claimed. The defendant excepts to certain of the findings of fact and to all of the conclusions of law, and urges upon this appeal that the judgment be reversed.

We are of the opinion that notwithstanding the heroic affirmations of plaintiff's counsel, and his many suggestions of what an honest man should do and say under given circumstances, this judgment is not right, and that it should not be affirmed. We do not believe the evidence in this case warrants the conclusion that there was constructive fraud on the part of the defendant, much less that there is evidence to support the conclusion that he was guilty of any actual fraud. The complaint sets out various causes of action, one upon a claim of the plaintiff and the others on assigned claims, substantially the same facts appearing in each case, so far as it is necessary to the consideration of the questions involved on this appeal. The theory of the complaint is that the defendant in this action, as the agent of the plaintiff and his assignors, purchased certain shares of stock, constituting a majority, of the United States Iron Company, which stock belonged to the defendant, without disclosing such ownership to the plaintiffs, and that they, upon the discovery of this fact, returned to him the stock issued to them for their subscriptions to the syndicate fund, and demanded the return of their money, thus rescinding the contract under which they had paid their money, and being entitled to recover the same in an action at law. There is no doubt of the rule of law invoked, but there is in our opinion no ground for its application to the facts in this case, and we are persuaded that the learned trial court has fallen into error in holding that the burden of proof was upon the defendant to show that he had not been guilty of constructive fraud. This seems to us clear from the complaint, which, in so far as it is not denied, must be accepted for the purposes of the action as true. This is certainly the rule as it applies to the plaintiff. He cannot be heard to dispute the facts alleged in his complaint; and if we read that document aright, in connection with the contract between the parties, which is made a part of the complaint, we are unable to understand how the defendant could be called upon to answer in damages in this action, or in any other, without showing that he had been guilty of some actual fraud, which must always be proved, and can never be presumed. The right to rescind a contract undoubtedly exists where an agent has purchased property of himself for his principal without disclosing the facts; and if the syndicate had seen fit to rescind that part of the

transaction which dealt with the property of the defendant Edenborn, or had brought an action to recover any profit he might have made in the transaction, or if the plaintiff, on the refusal of the syndicate to act, had come into a court of equity for relief from so much of the transaction as is above suggested, there might be great force in the proposition. But the plaintiff has not limited himself to the acts in relation to the property of the defendant, Edenborn. He has attempted to rescind the original syndicate contract, and to impose upon the defendant all the losses of the syndicate, without attempting to show that any of these losses resulted from the purchase of the property of the defendant. Indeed, the plaintiff admitted on cross-examination that he made no claim that Edenborn had turned in any property to the Sheffield Coal & Iron Company (the representative of the original syndicate) at a valuation that was not true, or at a valuation that was greater than he paid for it; so that we have a case where business men entered into an agreement to organize a syndicate involving $2,-500,000, expressly authorizing the purchase of a particular property at $1,000,000, and then permitting a few of the members of this syndicate to repudiate the whole transaction because subsequently the three syndicate managers carried out the purpose of the syndicate and purchased the stock of the United States Iron Company, not at $1,000-000, but at the rate of $70 per share, or $30 per share less than they were authorized to pay, and this without showing that the syndicate losses were due in any measure to the fact of such purchase. That is, assuming that Edenborn alone acted (that the two other syndicate managers were mere dummies as alleged in the complaint), the constructive fraud in purchasing property in which he was interested is permitted to relate back and to vitiate the original contract, which was made as between man and man, and in which Edenborn was not the agent or fiduciary of any living being, and without showing that it had anything to do with the losses which appear to have been made by the Sheffield Coal & Iron Company, and which furnishes the reason for the attempted repudiation of the contract. But there is not a scintilla of evidence (the allegation being denied) that the other two syndicate managers were Edenborn's dummies; for all that appears in the evidence they were men entirely capable and worthy of trust, and the law always presumes that men have done their duty until something is shown to overcome that presumption. It cannot be doubted that an agent has a right to deal with his own property for his principal if the latter is made aware of the facts and does not object, and, as the principal has a right to ratify the acts of his agent after knowing the facts, he has a clear right to waive that knowledge of the facts in advance, and he has a right to stipulate that the agent may deal with his own property for the principal. Matter of Pet. of N. Y. L. & W. R. R. Co., 98 N. Y. 447, 453, and authorities there cited; Sentenis v. Ladew, 140 N. Y. 463, 466, 35 N. E. 650, 37 Am. St. Rep. 569; Mayor of New York v. M. R. Co., 143 N. Y. 1, 26, 37 N. E. 494, and authorities there cited. In the Sentenis Case, supra, it was said:

"A party may waive a rule of law or a statute, or even a constitutional provision enacted for his benefit or protection, where it is exclusively a matter

of private right, and no considerations of public policy or morals are involved, and, having once done so, he cannot subsequently invoke its protection."

See People v. Bloom, 193 N. Y. 1, 85 N. E. 824.

In the light of these rules, let us examine this contract, that we may discover if there be any ground for this recovery. The contract in its first paragraph recites:

"Agreement, dated April 15th, 1902, by and between August Mann, Wm. Edenborn and J. C. Walker (hereinafter called the 'Syndicate managers'), parties of the first part, and the subscribers hereto, severally, parties of the second part, of whom each is hereinafter termed a subscriber, and all of whom, together with the said parties of the first part, constitute the syndicate."

And then it continues as follows:

"Whereas, an opportunity is afforded to acquire for a cash consideration the ownership, control and possession of the United States Iron Company of New Jersey, at par, said company being capitalized at one million ($1,000,000), and being the owner of valuable iron ore mines in operation and ore properties located in the states of Alabama and Tennessee, aggregating a tonnage sufficient to insure an ore supply for two or more blast furnaces for a long period; and a further opportunity presenting itself to acquire by cash purchase a valuable coal property situated on the border line between the states of Kentucky and Virginia, which property, being owned by the various parties, can be secured at reasonable prices; also other property."

Here we have in the very first clause, relating to the purposes of the syndicate, a statement that there is an opportunity to purchase a certain definitely pointed out property, involving an expenditure of $1,000,000, or two-fifths of the entire capital of the proposed syndicate, and there is not a word of evidence in the entire case that any one ever asked any questions of the defendant as to the ownership of this property, or that he ever evaded telling any one all about it, while there is evidence that he talked with some of the plaintiff's assignors, as well as with the plaintiff himself, while they were together as a committee of reorganization of a certain railroad property, in reference to his interest in this very property, and a fair reading of Edenborn's correspondence leads irresistibly to the conclusion that he was writing to men who were acquainted with his affairs, and whom he assumed to be in possession of the fact that he was interested in the United States Iron Company. It is entirely unreasonable to suppose that men subscribing from $10,000 to $50,000 to a syndicate aggregating $2,500,000, and being informed that two-fifths of the sum was to be expended in the purchase of the United States Iron Company, would not make some inquiries in reference to the property, if it was not already within their general knowledge; and the fact that the property was distinctly pointed out, and that there is not a particle of evidence to show that Edenborn ever attempted in any manner to cover up anything in relation to it, negatives the suggestion of fraud of any character in the transaction during the time that the syndicate was in the course of formation. If Edenborn had been attempting to do something underhanded, if he had been attempting to unload his property to the syndicate under cover, he could easily have transferred his stock in the United States Iron Company to a dummy, and thus have cover-

ed the matter. But he frankly proclaimed the purpose of purchasing this particular iron company and of bringing into the scheme other properties, thus putting every one on notice of just what was contemplated, and, if there was any one who wanted to know who owned the United States Iron Company stock, it could have been found out easily enough, and there is not the slightest reason to believe that Edenborn would not have told any one who had had the curiosity to inquire. It should be borne in mind that in the formation of this syndicate Edenborn was not the agent of any one. He was not occupying in any sense a fiduciary relation. He was simply proposing to the men to whom the subscription paper was presented to join with him in the purchase of the United States Iron Company and other properties, with a view to making money out of the project. There is not a particle of evidence that he ever made any fraudulent representations in reference to the matter, that he induced any one to sign it by fraudulent representations, and it is not disputed that the plaintiff himself asked for the opportunity of subscribing without any suggestion on the part of Edenborn. It was a contract between Mann, Edenborn, and Walker, as parties of the first part, and themselves and the other subscribers, as parties of the second part, and every subscriber voluntarily took upon himself the duties, obligations, and conditions of the contract, unless there was some fraudulent inducement to the making of such contract, and the case is barren of such evidence.

Passing over the exact language of this clause, which might be construed to mean that the entire group of properties was owned by "the various parties," let us continue the examination of the contract, keeping in mind that it is made a part of the complaint, and that it was without fraud in its inception. In the fourth paragraph we find this further recital that:

"Whereas the sum of one million ($1,000,000) dollars should be provided to secure all, or nearly all, the stock of the United States Iron Company, the sum of two hundred and fifty thousand ($250,000) dollars to purchase coal lands and to erect two hundred coke ovens; the sum of one million ($1,000,-000) dollars to erect two modern blast furnaces; and the sum of two hundred and fifty thousand ($250,000) dollars for other contingencies; or a total of two million five hundred thousand ($2,500,000) dollars; [and] whereas, it is deemed advisable and desirable that a syndicate be formed which shall furnish and supply the said sums, aggregating two million five hundred thousand ($2,500,000) dollars, for the purpose above mentioned, and that the parties of the first part should be and become the syndicate managers, and as such managers have the management of said syndicate and all the moneys and properties acquired. Now, therefore, this agreement witnesseth: That in consideration of the premises and mutual promises herein contained, the parties hereto agree, and the subscribers severally agree with each other and with the syndicate managers as follows:"

Certainly in these recitals there is no evidence of actual or constructive fraud, but a fair and frank avowal of a purpose on the part of the three individuals named to undertake the purpose outlined in behalf of those who should become subscribers. No one was compelled to subscribe. No one was under any obligation to subscribe, unless he was satisfied with the conditions, and, having notice of what

properties were to be purchased, and that some, at least, of such properties were owned by "the various parties," it is difficult to understand how any one could fairly claim to have been defrauded simply because the enterprise did not, in its practical working out, prove to be as profitable as they undoubtedly all expected it would be. If there were no fraudulent representations as to the properties, no fraudulent inducements held out to the subscribers—and such fraud cannot be presumed—where is the foundation for the second conclusion of law, that "the burden of proving that the plaintiff knew at the time of signing said syndicate paper or at any time thereafter that the defendant was the owner of said United States Iron Company, or that he transferred the same to the syndicate with the said plaintiff's consent and acquiescence, rested upon the said defendant, and that said defendant has failed to sustain the burden by satisfactory and convincing proof"? It may be remarked in passing that the evidence does not show that the defendant owned the United States Iron Company. The evidence is that he owned a considerable majority of the stock, and that he, in company with the other stockholders, consented to part with this stock, not at par, as outlined in the recitals above, and for which purpose the money was subscribed, but at 70 per cent. of the par value, the said stockholders taking stock in the new or reorganized company in payment at par. But, assuming that the defendant was a seller in the transaction, he had pointed out the property to be purchased, had named the figure which it was proposed to pay, and he clearly had a moral and a legal right to go to any man with this proposition and ask him to subscribe to the plan to purchase such property in connection with others, or alone, and such action on his part did not raise a presumption of fraud which he was bound to disprove, for he owed no obligation to disclose anything more than he had disclosed, for the persons to whom the scheme was presented were not dealing with him in subscribing to the agreement as their agent or representative, but as man to man.

The first paragraph of the actual agreement provides:

"The parties hereto hereby form a syndicate to purchase, acquire, use, develop and dispose of the lands and properties above mentioned, or so much or such part thereof as, in the judgment and opinion of the said syndicate managers, is deemed advisable and proper."

It is proper to here point out that, while the plaintiff is proceeding against the defendant alone, this contract was made with three individuals as parties of the first part. It is true, of course, that the plaintiff alleges that the other two were mere "dummies" for the defendant, but there is not a particle of evidence to sustain this proposition, and the respondent merely urges that because this was alleged in the complaint and denied by the defendant, and the defendant did not put the two alleged "dummies" on the stand to support his denial, it must be assumed they were "dummies," a conclusion supported by no rule of law with which we are familiar. But a very complete answer to the suggestion that August Mann and J. C. Walker were mere "dummies" is afforded by the fact that the plaintiff and other subscribers entered into this contract with them just as much as they

did with the defendant. The language of the contract is that it is "by and between August Mann, Wm. Edenborn, and J. C. Walker (hereinafter called the 'Syndicate Managers'), parties of the first part, and the subscribers hereto, severally, parties of the second part, of whom each is hereinafter termed a subscriber, and all of whom, together with the said parties of the first part, constitute the syndicate," and that, "in consideration of the premises and mutual promises herein contained, the parties hereto agree, and the subscribers severally agree with each other and with the syndicate managers as follows," and, further, that "the syndicate managers may be subscribers to the syndicate, and to the extent of such subscriptions or reservation by them shall be liable hereunder and shall be entitled in all respects to the same rights and benefits as other subscribers." The plaintiff and each of his assignors signed this contract without any fraudulent inducement, so far as the evidence goes; signed this contract, not with the defendant as party of the first part, but with August Mann, Wm. Edenborn, and J. C. Walker as parties of the first part, and as individual subscribers, thus entering into exactly the same relations with each of them, and no one pretends that any subscriber was forced to enter into this contract, or that any inducements were held out to them to contract with these parties of the first part. The above comments are equally applicable to the suggestion that the parties contracted relying wholly upon the defendant. They certainly did not contract in that manner, for the contract in terms is with all three of them, and in the fourteenth clause of the contract it is provided further that:

"Each and all of the rights, liabilities, acts, undertakings, powers, and authorities of the syndicate managers under this agreement, and in pursuance thereof, shall control and become operative and in force by the act or assent of any two thereof, and each and all matters and things to be done or performed in and under this agreement, and in and by said syndicate, and in and by depositaries, agents, trustees, and all other persons, firms and corporations connected therein shall be done and performed and carried out on the request, judgment and direction of the said syndicate managers when done by the act or assent of any two thereof."

As still further showing that the subscribers did not contract individually with the defendant, and did not rely upon him by the terms of their own written contract, we may state the fact that in the fifteenth clause of the agreement it is provided that:

The "death or disability of any one of said syndicate managers shall not dissolve or otherwise affect said syndicate, nor change or affect the syndicate managers; the survivor or survivors of said syndicate managers shall, in such event, substitute for such deceased or disabled member one of the subscribers to this syndicate, and the syndicate managers as so then constituted shall succeed to all the rights and powers of said syndicate managers, and proceed to carry out and consummate the purposes of this agreement and the object of said syndicate."

If the defendant had died on the day that the last subscription to the agreement was signed, it will thus be seen that under the contract the subscribers were equally bound to do just what has been done as though he had lived, and the same powers and duties would have devolved upon Mann and Walker that they had in connection with the defendant. Is it possible that the defendant was bound to

affirmatively show that these two men, who were with himself equally parties to the contract, were not his "dummies"? Have deliberate contracts no force? Is every man who openly and fairly presents a proposition to another man to be 'held to the obligation of affirmatively showing that every other man joined with him is a free and independent being? Is there any more reason for saying that Mann and Walker were the defendant's "dummies" than there is for saying that the defendant was their "dummy"? He certainly took as many chances as any of the subscribers, for he placed it in the power of these two men to overrule him in all matters, and contracted that, in case of his death or disability, both or even one of these men might select the other member or members of the syndicate managers. Where is the evidence of fraud on the part of the defendant in procuring the signatures of the plaintiff and his assignors to this agreement?

But this contract did not end with these provisions. It provided in great detail for the exercise of the discretion of the managers under the conditions above mentioned, and then in its thirteenth clause it is provided:

"The syndicate managers shall not be liable for any error of judgment or for any mistakes of law or fact; nor shall they be liable for any act or omission while endeavoring, in good faith, to carry out the purposes hereunder according to their judgment; and nothing herein contained, or otherwise, shall constitute the parties hereto partners, or shall render any of the subscribers liable to contribute more than his several and proportionate amount as herein provided, or shall prevent any of the parties from contracting with each other with reference to any of their respective interests."

What more could be done to give notice; what more is necessary to waive all right to such an action as is here attempted to be maintained on the part of the plaintiff and his assignors? Surely the plaintiff, who subscribed for $50,000 of the stock, was a competent business man. He knew the effect of language. The learned trial court finds as a fact that he requested an opportunity to subscribe to this agreement, and there is no evidence that any subscriber was induced by any fraudulent representations to become a member of the syndicate. Each one of them had a full and free opportunity to investigate and to act for himself in the signing of this contract, and each for himself, for a sufficient consideration, upon the performance of conditions, agreed that:

"Nothing herein contained, or otherwise, shall constitute the parties hereto partners, * * * or shall prevent any of the parties from contracting with each other with reference to any of their respective interests."

If a contract can mean anything, this contract fully authorized just what was done, and it waived all right to rescind any contract growing out of the agreement, directly or indirectly, under the rule which is invoked in this action, and which is sound law applied to proper facts, but which has no relation to a state of facts shown by the contract between the parties, and which the plaintiff makes a part of its complaint, and which must be binding upon him.

Great stress is laid upon the fact that the defendant subscribed this syndicate agreement, agreeing with the others to pay cash, and that he paid a portion of his subscription by turning over his stock in the

United States Iron Company at 70 cents on the dollar, paying only
about $125,000 of the $500,000 subscription in cash. But an examina-
tion of the word "cash," as judicially construed, will show that it has
various meanings, and is not confined to actual money. Indeed, it is
highly probable that neither the plaintiff nor any of his assignors paid
actual cash. In the great majority of transactions of this character
payments are made by check or draft, and it was in this sense that
the subscription was made. It was to be cash—that is, available
funds—as distinguished from notes or time obligations; and the fact
that Edenborn turned in his stock in lieu of money proves nothing.
It was the most natural way in the world to carry out the transac-
tion which had been directed by the subscribers, and it wronged no
one, nor did it indicate any element of bad faith on the part of Eden-
born. The plaintiff practically concedes—at least he disclaimed mak-
ing any claim that the defendant had turned in this property at an
excessive price—that the property was worth what it was put in for,
that it was the equivalent of money in the carrying out of the pur-
poses for which the syndicate was avowedly created, and it is mere
quibbling to suggest any wrong from this transaction.

To put the case in another light, suppose that Edenborn had died
on the day that the subscription became completed, and that Mann
and Walker, acting under the terms of the agreement, had selected the
plaintiff to fill the vacancy in the syndicate managers, and that the
latter had been directed by Mann and Walker to purchase the stock
of the United States Iron Company at 70 cents on the dollar; would
Edenborn's estate have been liable to the plaintiff for constructive
fraud? Would the plaintiff have had any authority, under the con-
tract, to refuse to carry out the direction of the syndicate managers?
Is the situation different because Edenborn lived and performed his
duty under the very letter and spirit of the contract? It seems to me
that the rights of the parties became fixed when that contract was
completed; that each subscriber to that syndicate entered into a mutu-
al contract with all of the parties as set forth in the instrument; and
that, when the subscribers were all entered upon the enterprise, there
was a positive duty on the part of the syndicate managers, acting
in good faith, to purchase the very property which had been pointed
out to them in the agreement on the best terms possible, and that, hav-
ing done this, under a contract which specially permitted dealing with
each other's interests, and which provided that the syndicate managers
should not be liable for any error of judgment or for any mistakes
of law or fact, and that they should not "be liable for any act or omis-
sion while endeavoring, in good faith, to carry out the purposes there-
under according to their judgment," the subscribers to the syndicate
agreement, as individuals, cannot repudiate their lawful contract, or
any of its stipulations, and hold the defendant, one of the syndicate
managers, liable to refund their investment. If this contract was a
good contract on the day of its final signing, and the plaintiff and
his assignors entered into it without fraudulent inducement, they are
bound by its terms and conditions, and they cannot repudiate their
obligations under that contract because of the very action which they

have authorized being carried out. Of course, if there was bad faith in the purchase of the United States Iron Company stock, the syndicate itself could repudiate the transaction, and under certain circumstances a court of equity might grant relief to the plaintiff, but this action proceeds upon the theory of a rescission of the original contract, and an action to recover the sums subscribed and paid in by the plaintiff and his assignors, and in such an action constructive fraud in relation to a subsequent matter, even if it existed, would not relate back to the original contract, but would be confined to the matter in which the fraud was worked, and there is no reason to believe that the plaintiff would care to have that particular transaction repudiated, leaving the Sheffield Coal & Iron Company with the other assets. The undercurrent throughout the action indicates that the losses were due to matters apart from the United States Iron Company, and that this transaction is picked out merely for the purpose of overturning, a contract which appears on its face perfectly fair and reasonable, and which appears to have been made and executed without fraudulent representations of any character.

The judgment appealed from should be reversed, and a new trial granted, costs to abide the event.

MILLER, J. The so-called syndicate agreement provided for the purchase of the stock of the United States Iron Company at par, and of certain coal lands, the erection of coke ovens and two modern blast furnaces, and the sale of the properties thus purchased and equipped, or the transfer of them to a corporation to be organized, whose stock was to be issued to the syndicate subscribers in proportion to their subscriptions. The things contemplated were done; the properties were purchased and improved; the corporation was organized; the property transferred to it; and its stock was issued to the syndicate subscribers for the amount of their subscriptions. The trial court has found, and the evidence supports the finding, that the plaintiff requested permission to subscribe to the syndicate agreement. The claim of fraud is twofold: First, that the defendant agreed to pay his subscription of $500,000 in cash, without intending to do so; second, that he purchased, as agent of the syndicate, the stock of the United States Iron Company, of which he owned 5,365 shares.

If the agreement obligated the defendant to pay his subscription in cash, the remedy for the breach of it, if there has been a breach, is not an action for fraud. It may be conceded that the defendant was guilty of constructive fraud in purchasing for the syndicate the stock of the United States Iron Company. While the agreement contemplated the purchase of the stock at par, it was still the duty of the defendant to acquire it as cheaply as possible. The fact that he purchased the stock at 70, whereas under the agreement he might have paid par, may be evidence of his good faith; but the law does not suffer one, even in good faith, to have personal interests which may conflict with fiduciary duties. The principal could have disaffirmed the contract, or, accepting the benefits of it, could have main-

tained an action to compel the defendant to account for any profit which he may have made. But the defendant's principal was the syndicate which was succeeded by the corporation; and the right of the syndicate or its successor, the corporation, to rescind the purchase of said stock, does not give the syndicate subscribers the right to rescind their subscription contract. The contract of purchase of said stock, not the subscription contract, was rendered voidable by the defendant's constructive fraud.

Brewster v. Hatch, 122 N. Y. 349, 25 N. E. 505, 19 Am. St. Rep. 498, is perhaps as favorable to the plaintiff's contention as any case to be found in this state; but in that case it was held that the promoters of the corporation were liable in damages to those who were induced by fraudulent concealment and misrepresentation to subscribe for stock. The prospectus, the promotion agreement, and all the surrounding circumstances in that case established what was, in effect, an actual misrepresentation, respecting the value of the property which was to be purchased. The subscribers were led to believe that the issue of stock fairly represented the value of the property, whereas the promoters had options to purchase at a sum so much less that they were enabled to pay for the property out of the subscriptions for stock and retain to themselves a majority of the stock without paying anything for it. That case is in no respect like this. Mack v. Latta, 178 N. Y. 525, 71 N. E. 97, 67 L. R. A. 126, was an equity suit against the corporation and individual officers of it to cancel a subscription to stock and to recover a part payment, on the ground of actual misrepresentations, made by said officers, inducing said subscription—an entirely different case from this. In the case of Getty v. Devlin, 54 N. Y. 403, subscriptions were induced by actual misrepresentations respecting the values of the property to be purchased; but in that case it was held that the plaintiffs could not recover back all the money paid by them because they could not restore the defendants to the position they were in before the transfer of the real property to the company. Here we have a case in which no fraud inducing the subscription is shown, but only a constructive fraud, subsequent to the syndicate agreement, upon the syndicate members jointly, to whose rights a corporation has succeeded. Obviously in such case the stockholders cannot, in an action at law for damages, compel the defendant to purchase their stock. Their action, if they have one, is a representative action.

The judgment is reversed.

JENKS, J., concurs.

GAYNOR, J. (dissenting). The case is simply this: The defendant induced the plaintiff and his assignors to sign an agreement to contribute the sums specified opposite the names of each for the purchase of the United States Iron Company of New Jersey, which had a par capital stock of $1,000,000, and also "a valuable coal property situated on the border line between the states of Kentucky and Virginia, which property, being owned by various parties, can be secured at reasonable prices"; and the said agreement appointed the defendant, and two others who were subject to him and mere in-

struments in his hands, as "syndicate managers" to purchase such of the said properties as should by them be "deemed advisable and proper." The defendant signed this agreement first of all for a subscription of $500,000 ·in cash.  He in fact owned one-half of the capital stock of the said New Jersey corporation, but concealed that fact from the plaintiff and his assignors, and when the subscriptions were paid in, the stock of the said corporation was bought by the defendant and his two associates for the syndicate, and he paid his subscription by. turning over his said stock to the syndicate at $70 a share, and paying only the balance in cash.  The rule that if a trustee or agent buy of himself for his cestui or principal, the transaction is fraudulent, and may at the election of the· cestui or principal be deemed void, has full application to the case.  Davoue v. Fanning, 2 Johns. Ch. 251; Clark v. Bird, 66 App. Div. 284, 72 N. Y. Supp. 769; Getty et al. v. Devlin et al., 54 N. Y. 403; Brewster v. Hatch, 122 N. Y. 349, 25 N. E. 505, 19 Am. St. Rep. 498.  The defendant perpetrated a fraud on the plaintiff and his assignors.  As soon as they discovered it, they tendered back the certificates of stock in the corporation formed by the said managers of the syndicate to take over the properties purchased which had been issued to them for the amounts of their subscriptions, and demanded back the said amounts; which, being refused, this action was brought to recover the same.

The judgment should be affirmed.